**Ruth STEWART et al., Plaintiffs,**

**v.**

**Joseph HANNON et al., Defendants.**

**No. 74 C 2466.**

United States District Court,
N. D. Illinois, E. D.

April 17, 1979.

---

Richard F. Watt, Thomas D. Allison, Michael H. Slutsky, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiffs.

John E. Angle, David L. Carden, Kirkland & Ellis, Chicago, Ill., for defendant Educational Testing Service.

Michael J. Murray, Chicago, Ill., for all other defendants.

## Memorandum

LEIGHTON, District Judge.

This is a suit to redress alleged racial discrimination in public employment. Jurisdiction of the court is invoked under 28 U.S.C. § 1343; 42 U.S.C. § 2000e–5; and the doctrine of pendent jurisdiction. The cause comes before the court on motions by all defendants under Rule 12(b)(6), Fed.R. Civ.P., to dismiss the amended complaint for failure to state a claim on which relief can be granted. For the following reasons, the motions are granted.

### I.

The plaintiffs are the Chicago High School Assistant Principals Association ("CHSAPA") and seven of its members who are currently assistant principals in the Chicago Public School System and who have each tried unsuccessfully to become high school principals. Defendants are two members of the Board of Examiners of the Chicago Public School System, the Chicago Board of Education, its members as individuals, and Educational Testing Service ("ETS"), a non-profit corporation that develops and administers tests and does occupational and educational research.

In Count I plaintiffs allege that they have been deprived of their constitutional rights as secured by the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983; in Count II they allege a violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, et seq.; and in Count III they allege a violation of a state statute, Ill.Rev. Stat. ch. 122, § 34–83, that mandates examination of the "character, scholarship, and general fitness" of candidates for principalships in the public schools of Illinois.

To become a principal in the Chicago Public School system, a candidate must meet certain requirements of education and experience. In addition, each candidate must pass the principalship examination set by the Board of Examiners by statutory mandate. This examination comprises two parts: a written portion, which is the portion challenged in this lawsuit, and an oral portion. A candidate may not take the oral portion unless he has attained the designated passing score on the written portion. Further, a candidate must pass both portions in order to be placed on the eligibility list, from which the Board of Education ultimately draws principals as openings occur.[1] Plaintiffs allege that the written portion of the examination is discriminatory because the passing score is set so that even "qualified" persons do not attain it and because fewer blacks and hispanics than whites attain the designated passing score.

With respect to ETS, plaintiffs allege that the Board of Education contracted with ETS to develop and grade the written portion of the principalship examination. ETS developed such an examination, variations of which were used in 1970 and 1974 and were to be used in 1978, the test plaintiffs sought to enjoin. Neither ETS nor the Board ever field-tested or otherwise validated the written portion for job relevance. What ETS did do was to meet with the Board to discuss the specifications for the test, specifically the passing grade the Board desired (80) and what the grade would mean in terms of the percentage of candidates who would pass the test. Further, ETS developed the form and mix of the test questions and the derivation and conversion of raw scores to the proper scale. ETS administered and scored the examinations, developed the manual of instructions, scored the examinations, sent a list of candidate numbers and scores to the Board of Examiners, and analyzed the results of the 1970 and 1974 examinations. All of this amounted, plaintiffs allege, to "ETS['s taking] over and exercis[ing] the examining functions imposed by statute on the Board of Examiners."

Defendants raise numerous arguments attacking the legal sufficiency of the allegations of Counts I and II of the amended

1. Thus certification is itself no guarantee of an appointment.

complaint to state claims for relief under the Civil Rights Acts of 1866 and 1871 and Title VII. The court approaches the issues presented mindful of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The court finds that the entire suit must be dismissed as to all parties for a variety of reasons.

## II.

■ In Count I, the sole question is whether the Board of Examiners set the passing score in such a way as to violate the plaintiffs' constitutional right to be free from discrimination. Plaintiffs allege that the defendants, by setting the passing score "arbitrarily," unlawfully discriminated against them on the basis of race. As a result of the defendants' arbitrary action, they allege, competent candidates, including Blacks and Hispanics, are excluded from consideration for principalships. Plaintiffs allege further that there is a disparity between the passing rates of whites and minorities, and that the percentage of minority principals currently serving in the system (30%) is disproportionate when compared with two groups: the percentage of minority teachers (46%) and the percentage of minority students (75%). Even accepting all these allegations as true, which the court must for purposes of this motion, plaintiffs fail to state a claim on which relief can be granted.

Plaintiffs' amended complaint focuses on the fact that the results of the Board's score decision affect blacks and whites disproportionately; it does not contain any allegation, or even implication, that the Board's decision was motivated by an intent to exclude blacks and hispanics from the eligibility list. Such intent is required by the leading case on constitutionally based discrimination charges:

[O]ur cases have not embraced the proposition that a law or other official act, *without regard to whether it reflects a racially discriminatory purpose,* [emphasis supplied] is unconstitutional *solely* [emphasis in original] because it has a racially disproportionate impact. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

Later cases have made it clear that the *Washington* requirement of purposeful racial discrimination applies to cases brought under 42 U.S.C. §§ 1981 and 1983 as well as to cases based directly on the Constitution. *See, e. g., United States v. City of Chicago,* 549 F.2d 415, 435 (7th Cir.), *cert. denied sub nom. Arado v. United States,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *City of Milwaukee v. Saxbe,* 546 F.2d 693, 705 (7th Cir. 1976).

■ Although the lack of an allegation of intent has alone been fatal to a cause of action, the question of disproportionate impact is not entirely irrelevant. As the court implies in *Washington,* impact alone may suffice to make out an adequate claim, but only if there is other strong evidence that the exclusion of the discriminated group was systematic (as in consistent exclusion of Blacks from juries). 426 U.S. at 241, 96 S.Ct. 2040. Not only do plaintiffs' allegations fail to present such evidence of systematic bias, their allegations directly refute such a factor: they allege that the choice of the passing score was in fact arbitrary. Moreover, the gist of their complaint is that the arbitrariness, and therefore the illegality, lay in rejecting competent candidates (impliedly of all races), not in rejecting competent blacks while accepting whites. The court in *Washington* addresses this point directly:

As an initial matter, we have difficulty understanding how a law establishing a racially neutral qualification for employment is nevertheless racially discriminatory and denies "any person . . . equal protection of the laws" simply because a greater proportion of Negroes fail to qualify than members of other racial or ethnic groups. Had [plaintiffs], along with all others who had failed [the employment test under attack], whether

white or black, brought an action claiming that the test denied them equal protection of the laws as compared with those who had passed with high enough scores to qualify them . . . it is most unlikely that their challenge would have been sustained. 426 U.S. at 245, 96 S.Ct. at 2050.

Justice White continues by suggesting that it is legitimate to use tests of competency to try to upgrade or maintain a certain level of skill in an employee pool and that those who are less competent, as measured by such tests, cannot complain of discrimination vis-à-vis those who are more competent:

> [Plaintiffs], as Negroes, could no more successfully claim that the test denied them equal protection than could white applicants who also failed. The conclusion would not be different in the face of proof that more Negroes than whites had been disqualified by [the test]. That other Negroes also failed to score well would, alone, not demonstrate that [plaintiffs] individually were being denied equal protection of the laws by the application of an otherwise valid qualifying test being administered to prospective . . . recruits. 426 U.S. at 246, 96 S.Ct. at 2050–51.

That is exactly what plaintiffs in this action claim. They do not allege that those who achieve the requisite score of 80 are less competent in any way than those who fail; they do not allege that the test does not fairly sort out the more from the less competent. They do allege that the content of the test is biased against minorities, but their support for this is again the fact that some competent persons do not pass: that is not a function of the test content, but simply of the passing score. There is no allegation that, had the score been set at some other point, the proportion of blacks to whites passing would have been significantly different or less "discriminatory." It seems that the score was chosen so that, in

a situation where there are more qualified candidates than openings, the Board would have both the most qualified candidates (as determined by it) and the requisite size pool from which to choose. This is not the kind of selection that is prohibited by 42 U.S.C. §§ 1981 and 1983. Therefore, Count I of plaintiffs' complaint must be dismissed as to all defendants.

■ Moreover, both the § 1981 and § 1983 claims of Count I must fail for additional reasons as to ETS. Section 1981 states in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens." The essential right secured by this statute is the right to enter into contracts free from racial discrimination. E. g., *Johnson v. Railway Express Agency*, 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Waters v. Wisconsin Steel Wks. of Int. Harvester Co.*, 427 F.2d 476, 483 (7th Cir.), *cert. denied*, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). Despite plaintiffs' argument that § 1981 is broader and "does not apply simply to contracts," the fact remains that the right asserted in this suit is a contract right—the right to enter into an employment contract with the Chicago Board of Education and be a high school principal.[2] To whatever extent plaintiffs have a valid § 1981 claim, that claim must run to the party—the Board of Education—with whom plaintiffs' contractual rights have allegedly been impaired. That claim does not run to ETS, with whom no contractual relationship, either actual or potential, is alleged. ETS has not discriminatorily refused to allow plaintiffs to contract with it (as, for example, by denying plaintiffs access to a test while providing such access to whites). In fact, ETS has not entered into a contract with plaintiffs at all, much less one whose terms are different from the terms offered to whites with a similar contract. ETS is thus remote from the contractual relation-

---

**2.** While the statute can be read, as plaintiffs suggest, to include other rights, the complaint recites no other rights that have been violated.

Nor do plaintiffs cite any case where a right other than a contractual one was vindicated under § 1981.

ship here at issue. Moreover, there is no allegation that overcomes this remoteness: there is neither an allegation that plaintiffs should be or can be viewed as third-party beneficiaries of the contract between ETS and the Board of Education nor an allegation that ETS has interfered in some way with the contract or potential contract between plaintiffs and the Board of Education.

Plaintiffs cite *Chance v. Board of Examiners*, 458 F.2d 1167 (2d Cir. 1972), to support their contention that they have stated a claim of discrimination by alleging differential passing rates for whites and minorities. In *Chance*, the court ruled that candidates for principalships in New York City stated a case that was sufficient to fend off dismissal by alleging a significant difference in the passing rates for whites and minorities on the principalship examination. That case is inapposite to the present motion, since no third-party test-constructor was involved there.

■ Plaintiffs' § 1983 claim is also insufficient as a matter of law to state a claim against ETS. A § 1983 claim must allege two elements:

[Plaintiffs] are first bound to show that they have been deprived of a right "secured by the Constitution and the laws" of the United States. They must secondly show that [defendants] deprived them of this right acting "under color of any statute" of the State of [Illinois]. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978).

Plaintiffs fail to allege adequately the first of these essential elements. At issue here is the specific right, guaranteed by the Fourteenth Amendment, to be free from racial discrimination by the state. Since ETS is a private party, its acts are plainly not those of the state. To hold a private party liable under § 1983, plaintiffs must establish that ETS' actions are properly attributable to the state, and hence constitute "state action". A private party can be held liable for discriminatory acts under § 1983 if, in performing the acts, it asserts powers

or rights "traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974).

■ The selection of principals for public high schools is arguably an exclusive function of the sovereign. However, the essential part of that function, the actual hiring decision, remains with the Board, it has not been delegated to ETS. Plaintiffs themselves state:

In fact, by instructing or allowing ETS to calculate the grades in the manner [alleged], the *Board of Examiners* in effect *predetermined* how many of, or what proportion of, the applicants taking the written examination would pass it. . . . By relying on the examination formulated and graded by ETS, the *Board of Examiners has unlawfully discriminated against . . . plaintiffs.* . . . Amended Complaint, Count I, ¶¶ 15–16 (Emphasis added.)

The final hiring decision—the public function—remains in the hands of the state agents, the Boards of Examiners and of Education; it has neither been delegated to nor usurped by ETS. ETS' role is but a part of the entire hiring process, which also includes an oral examination, educational and experience requirements, and selection from the eligibility list. Moreover, such intermediate decisions as were made by ETS did not involve individuals. ETS' preparation and grading of the examination cannot be viewed as "state action."

Plaintiffs cite *Kissinger v. New York City Transit Authority*, 274 F.Supp. 438 (S.D.N.Y.1967), but that case is not dispositive. *Kissinger* held that a contract between a private firm and a state agency to perform the agency's functions was sufficient to bring the private firm within the strictures of § 1983. But the private firm in *Kissinger*, unlike ETS in the present situation, was making the final decisions (as to which advertisements would and would not be displayed on public conveyances). The private firm in *Kissinger* could thus make potentially unconstitutional decisions. ETS, because it makes neither final deci-

sions nor decisions about individuals, does not have the same potential to make such unconstitutional decisions. Thus, to see whether the public function doctrine should apply to color ETS's actions as "state action," the court must look not at the mere existence of a contract between the state agency and the private firm, but must examine the terms of the contract to see what powers it leaves properly with the state agency.

◼ Insofar as plaintiffs assert that the two Boards merely allowed or acquiesced in ETS' allegedly discriminatory manipulation of the test content and scores, such acquiescence is insufficient to transform ETS's conduct into "state action." Fourteenth Amendment restraints cannot be imposed on private action by the simple device of characterizing the state's inaction as authorization or encouragement. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. at 164–65, 98 S.Ct. 1729. Thus, plaintiffs' reference to the Board's inaction as "allowing" ETS to calculate grades designed to eliminate competent candidates or "acquiesc[ing]" in ETS's determination" as to what a score of 80 should "mean" is insufficient as a matter of law to constitute "state action." For these additional reasons, therefore, Count I must be dismissed as to ETS.

Count II of the amended complaint alleges that the Board of Education violated Title VII, 42 U.S.C. § 2000e, *et seq.*, by relying on an examination that sets an arbitrary passing score and discriminates on the basis of race and national origin.[3] Plaintiffs allege that the percentage of minorities who achieve the passing score is lower than the percentage of whites who do so, and that the racially disproportionate impact is illegal. The relevant statistics, which for purposes of this motion the court assumes are correct, are:

| | 1970 | 1974 |
|---|---|---|
| Whites | 25.0% | 21.4% |
| Blacks | 21.9 | 14.9 |
| Hispanics | 33.3 | 20.6 |

◼ As the chart shows, the largest disparity occurred in 1974 between whites and blacks. Yet even this disparity is relatively small: a total difference of 6.5%, it translates into a statistic that the pass rate for whites was 1.43 times that for blacks. The other disparities are all smaller. On its face, this is not the kind of "gross statistical disparity" that may, in a proper case, constitute *prima facie* evidence of a pattern or practice of discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

In what may be factually the most similar case, the Court of Appeals for the Second Circuit upheld a district court's finding of *de facto* discrimination based on disparate impact as evidenced by statistics. *Chance v. Board of Examiners*, 2 Cir., 458 P.2d 1167. The district court found that whites passed the challenged examination at almost 1½ times the rate of Blacks. *Chance v. Board of Examiners*, 330 F.Supp. 203, 223 (S.D.N.Y.1971). But the district court relied on other evidence as well as the examination pass rate. In *Chance*, other data established a greater disparity in the pass rate on other preliminary examinations set by the same defendant and a much lower minority hiring rate than is alleged here; there minorities held 1.4% of the principalships and 7.2% of the assistant principalships; here, minorities hold 30% of the principalships. *Id.*; Amended Complaint Count I, ¶ 20.

Other cases that have held statistical evidence sufficient to establish a *prima facie* Title VII claim have relied both on greater disparities than are alleged by plaintiffs here and on statistical disparities in conjunction with other evidence of discrimination. *See, e. g., Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158

---

3. Plaintiffs have conceded that ETS cannot properly be charged with a Title VII violation because it is neither plaintiffs' employer, an employment agency, nor a labor organization, and accordingly, it is not covered by the substantive provisions of Title VII. *See* Section 701(b) ·(d) of Title VII, 42 U.S.C. § 2000e(b)–(d).

(1971) (passing rate disparities of 2.8 to 1 and 9.7 to 1); *United States v. City of Chicago*, 7 Cir., 549 F.2d 415 (hiring rate disparity of 3.4 to 1, passing rate and promotional rate disparities of 2 to 1, 3 to 1, and 4 to 1); *United States v. Georgia Power Co.*, 474 F.2d 906 (5th Cir. 1973) (employment rate disparities in the range of 4.6 to 1, with most of the few blacks in menial positions; failure rate disparities of 44 to 1, 34 to 1, and 32 to 1 on written examinations); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973) (employment rate disparity of 6.9 to 1 and passing rate disparity of 3.4 to 1 on written examination); *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972) (employment rate disparity of 7.1 to 1, passing rate disparities of 6.5 to 1 and 2.6 to 1, respectively, for hispanics and blacks); *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970) (employment rate disparity of 12 to 1, with most of the few black employees relegated to positions as janitors, cleaning ladies, or laborers); *cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (standards "similar to those obtaining under Title VII" applied under Civil Service Act and District of Columbia Code; failure rate disparity of 4 to 1); *Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976) (lower court finding of *prima facie* discrimination reversed though it was based on (1) employment rate disparity of 5 to 1 and (2) passing rate disparities of 3.23 to 1, 7.00 to 1, and 2.74 to 1 on written test; small disparity of only 1.14 to 1 in actual hiring rates in recent period shows absence of discrimination); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506 (8th Cir. 1977) (written test resulted in "pass" rate disparity of only 1.71 to 1 but produced a promotion eligibility list on which *all* the blacks that passed ranked far too low to have a chance for promotion during the two-year life of the list).

■ The discrepancy in pass rates alone is thus insufficient to avoid dismissal for failure to state a claim, particularly where, as here, the entire claim is based on the difference in pass rates. Plaintiffs specifically do not allege that any of the other factors that also go into the hiring decision: experience points, oral examination, and selection from the waiting list, are also discriminatory.[4] The challenge is thus to one component of the hiring decision, not to the decision itself. This is not enough; as one court stated:

> Without reaching the question of the [challenged test's] job-relatedness . . . we hold that plaintiff has failed to demonstrate prima facie that the test is unlawfully discriminatory. Though general ability, or intelligence, tests have often been invalidated for their racially disproportionate impacts, . . . the disproportionate impacts have been in the hiring, rather than in the test results in and of themselves. *Smith v. Troyan*, 520 F.2d at 497–98 (citations omitted).

Another court, in holding that plaintiffs had made out a *prima facie* § 1981 and § 1983 claim, noted that the relevant issue is not the impact of the components of the hiring process, but the end result:

> [T]he examination may not be truncated; whether or not it has an adverse discriminatory impact upon minority groups should be considered in terms of the total examination procedure. Here there can be no doubt, whatever the relative impact of the component parts, that in end result there was a significant and substantial discriminatory impact. *Vulcan Soc. of N.Y.C. Fire Dept., Inc. v. Civil Serv. Comm.*, 360 F.Supp. 1265, 1272 (S.D.N.Y.), *modified on other grounds*, 490 F.2d 387 (2d Cir. 1973).

---

4. The amended complaint contains no allegations concerning the actual comparative hiring rates for whites and minorities. It is alleged that the percentage of minority principals is less than that of minority teachers or minority pupils (Amended Complaint, Count I ' 20), but neither of these is an appropriate or relevant comparison group. *See Hazelwood School District v. United States*, 433 U.S. at 308, 97 S.Ct. 2736. The relevant comparison is between (1) the racial composition of the group of persons qualified to do the job and (2) the racial composition of the group actually hired. The amended complaint does not raise this issue.

Because plaintiffs allege only small and intermittent racial statistical disparities in the pass rate of the facially neutral written examination, which itself constitutes only one part of the hiring decision, and because plaintiffs do not allege any other facts suggesting racial discrimination in comparative hiring rate, the court holds that plaintiffs' statistics relating to test scores are insufficient to state a claim under Title VII. Therefore, Count II of the plaintiffs' amended complaint must be dismissed.

For the foregoing reasons, defendants' motions, under Rule 12(b)(6), Fed.R.Civ.P., to dismiss Counts I and II of the amended complaint for failure to state a claim are granted. Count III alleges a violation of state law. Because the federal law counts are dismissed, the court declines to exercise pendent jurisdiction over the state law claim. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, this suit is dismissed in its entirety.

So ordered.