UNITED STATES of America,
Plaintiff,

v.

Ricardo NORCOME, Defendant.

Crim. No. 2047-72.

United States District Court,
District of Columbia.

May 21, 1974.

William Collins, Stephen Grafman, Peter Schaumber, Jason Kogan, David Bullock, John Bayly, Asst. U. S. Attys., for the United States.

Linda R. Singer, Washington, D. C., for defendant.

## INTRODUCTION

CHARLES R. RICHEY, District Judge.

This case came before the Court for the sentencing of Ricardo Norcome, age 20, who was convicted of conspiracy and robbery of a Federal savings and loan association. Since the Defendant was eligible for sentencing under the provisions of the Federal Youth Corrections Act, 18 U.S.C. § 5005 et seq., the Court ordered the Defendant committed to a Youth Center for 60 days of observation and study and the preparation of a report to aid sentencing pursuant to 18 U.S.C. § 5010(e).

The report recommended that the Defendant be denied his "presumptive right to rehabilitative treatment"[1] in a special youth facility and, instead, be sentenced as an adult. The seriousness of this recommendation, in light of the

Congressional mandate under the Youth Act to substitute rehabilitation for retribution in the sentencing of young persons convicted of federal crimes[2] necessitated the Court's close scrutiny of the report. In its review, the Court concluded that the report did not provide an adequate statement of reasons explaining why the Defendant would not derive benefit from Youth Act programs and it did not provide adequate factual data to support the recommendation. The Court, therefore, ordered a *second* § 5010(e) study and report. Upon reviewing the body of the report and the conclusions reached therein, the Court found that the Classification Committee which prepared the findings and recommendation had not focused upon whether the Defendant would "derive benefit from treatment under" the Act's youth treatment provisions, nor had it applied the test of "incorrigibility" to the facts gathered during the period of study and observation. See 18 U.S.C. § 5010(e), United States v. Coefield, 155 U.S.App. D.C. 205, 476 F.2d 1152 (1973) (en banc).

The second § 5010(e) report was submitted 60 days later and contained the same recommendations as the first study. The shallowness of the second report, the so-called "Addendum Report", and its failure to relate the factual data to the conclusions reached therein, made it necessary for the Court to hold a fact-finding hearing. The hearing was important first, to develop an adequate body of information with which to make a well-reasoned decision respecting the Defendant's sentence and, second, to ascertain the investigatory measures and analytic tools employed by corrections personnel in preparing the reports as well as the nature and extent of their training and their reasons for relying in their recommendation on cliches such as "severity of the offense", the Defendant's need for "structured setting", the Defendant's "empty" and "bland" personality, the Defendant's "lack of moti-

---

1. United States v. Phillips, 156 U.S.App.D.C. 217, 479 F.2d 1200 (1973).

2. H.R.Rep.No.2979, 81st Cong.2d Sess. (1950). 2 U.S.Code Cong.Serv.1950, p. 3983.

vation", or his "hedonistic behavior", etc. In the course of the hearings the Court heard testimony from all federal and District of Columbia corrections personnel who had participated in the preparation and review of the aforementioned § 5010(e) studies.

The Court felt then and feels now that a thorough exploration of the facts in the instant case and examination of the administrative practices applied by the Government· in undertaking the expensive § 5010(e) diagnostic study was necessary. The record of the hearing reflects administrative practices in the diagnostic examination of youth offenders that border on extreme governmental dereliction of Congressionally-mandated responsibilities under the Act. By way of introduction it is worthwhile to highlight several examples of carelessness in the preparation of the instant § 5010(e) reports which undercut completely the usefulness of the administrative findings submitted to the Court in aid of sentencing.

First, *the Court found that before the second § 5010(e) study was returned to the Court, a Classification team at Lorton Youth Center II, where the Defendant underwent the second study, recommended that the Defendant receive a Youth Act sentence. But the team's re-port and recommendation was never made known to the Court, and was ignored by the Classification Committee at Youth Center II* which prepared both the original and addendum reports for the Court. It only came to light as a result of the Court's hearings and inquiry into the facts of this matter, as it was found in the institutional file. [Court's Exhibit 5] Second, *both of these reports relied on a pending charge cited therein which had, in fact, been dismissed six weeks before the original report was prepared.*

■ It should also be noted at this point that on the eve of the first hearing, the Assistant United States Attorney representing the Government, who is also the Chief of the Criminal Division in this Court, submitted to the Court a letter from the United States Bureau of Prisons withdrawing its initial recommendation in favor of a youth sentence. [Court's Exhibit 3] No reasons were provided. In light of this changed position, government counsel requested the Court to sentence the Defendant pursuant to one of the commitment provisions of the Act and to recommend that the Attorney General place the Defendant in a federal youth facility rather than a youth center administered by the District of Columbia.[3]

---

3. The recommendation of the Assistant United States Attorney that the Court request the Defendant be committed to a Federal youth facility is important, since the Government maintained throughout the course of the Court's investigation into the factual data underlying the § 5010(e) studies submitted in the Defendant's case that the Defendant should be sent to an adult facility. Evidence introduced into the record of the Court's hearing explains the Government's preference for commitment in a Federal youth facility as opposed to the District of Columbia's Lorton Youth Center. That evidence consists of several tables that serve as guidelines for administrative decision-making for youth offenders. These remarkable tables issued by the Department of Justice to assist corrections officials in parole, release, supervision and recommitment of youth offenders appear at 38 Fed.Reg. 31912 (Monday, November 19, 1973), and are attached to this Opinion as *Appendix A*. The tables show corrections authorities what is the customary range of time to be served before re-lease, assuming a prisoner's good institutional adjustment and program progress. This range of time is directly correlated to the "severity of the offense" for which the youth was committed.

Thus, the tables recommend that where a youth offender, as in Defendant's case, commits armed robbery, a commitment period of 26 to 36 months will serve to insure a "very good" possibility that he will not violate his eventual parole or the conditions of his release where parole is not provided.

To the extent that *this table* interfaces the decision-making of .corrections authorities to whom Congress assigned the responsibility of providing individualized treatment for youth offenders, it *makes a mockery of the Federal Youth Corrections Act.* Congress did not mandate that the commitment of youths who participated in so-called serious crimes be for a longer period of time than others. *Treatment is to be individualized and progress is to be diagnosed in a highly personal manner by the staffs at youth facilities.* 18 U.S.C. § 5014. *Release, therefore,*

The Court denied this request and commenced the hearing. During the hearing, each person called to testify because he participated in the preparation of the two § 5010(e) reports *reversed* his original recommendation and agreed that Youth Act treatment was appropriate in this case. On the basis of this testimony, and in light of the evidence introduced into the record, the Court determined the Defendant was eligible for Youth Act treatment and, accordingly, sentenced him pursuant to the terms of 18 U.S.C. § 5010(b).

■ While the matter might appropriately end here, the facts of this case insofar as they shed light on the administration of the § 5010(e) study process, have significance far beyond the instant matter of sentencing. The reason is clear. In every Youth Act case, this Court is compelled to take a "hard look" at the record and, where a § 5010(e) report and recommendation is ultimately followed by the Court, to make certain that the diagnostic staff has properly focused on the relevant issues. This "hard look" compulsion comes from a recent line of cases decided by the United States Court of Appeals for the District of Columbia Circuit requiring this Court to make an explicit "no benefit" finding before sentencing a youth offender to an adult prison. See, for example, United States v. Coefield, *supra*. Since the determination that a youth will not derive benefit from Youth Act treatment is largely a question of fact, *this Court*, to the ex-

tent it relies on a § 5010(e) report, *must ensure in making the requisite findings that the facts have been gathered in a fair and comprehensive manner without distorted emphasis by the diagnostic staff on factors such as the nature of the offense, the youth's juvenile record, or his level of performance on intelligence tests that are culturally biased against the vast majority of young offenders.*

■ The "hard look" taken in this case was fortuitous indeed because it revealed a maladministration of the Youth Act for reasons of inadequate staffing and facilities and sheer overwork, as well as lack of training and expertise in the current status of the law and the behavioral sciences. As a result of these inadequacies, the courts are receiving inaccurate, erroneous and wholly misleading § 5010(e) reports and recommendations. The human price of such errors is incalculable. The Court cannot help but wonder how many young people between the ages of 18 and 22, whom Congress intended to be treated in special youth facilities, are now in adult prisons where the likelihood of their becoming habitual criminals is enhanced considerably as a result of their association with older, more sophisticated and hardened criminals.[4] It is hoped that the recitation of facts along with the comments and recommendations in this Opinion will illustrate the need for changing the § 5010(e) diagnostic system so that it will no longer be the farce it is today, as is revealed by the record herein.

---

has to do with adjustment in programs and response to treatment, not with the nature of the crime committed.

These tables are even more incredible when one contemplates the vast expenditures of money for § 5010(e) studies, 18 U.S.C. § 4253 Narcotics Rehabilitation Act studies, Presentence reports by the United States Probation Office, and the like, while agreements are made through the form of regulatory guidelines by the Federal Bureau of Prisons and the United States Board of Parole which relate the time of an offender's incarceration to the seriousness of the offense and not to his or her response to special treatment programs mandated by Congress and the Courts. *This gives rise to the inevitable question as to whether the Execu-*

tive Branch of Government is making a mockery of the laws passed by Congress as well as the sentencing function of the Federal Courts. Such agreements or guidelines governing the release of prisoners are also contrary to the implied and express promises made to all prisoners upon their admission to penal institutions that their prospects for release and parole are not arbitrarily determined but rest upon their efforts to abide by the institutional rules and conform their behavior to acceptable institutional and social standards. See also *Appendix B, Guidelines for Parole Board Decision-Making in NARA cases.*

4. H.R.Rep.No.2979, 81st Cong.2d Sess. (1950), 2 U.S.Code Cong.Serv.1950, p. 3983.

## II

FACTS AND ANALYSIS OF ALLEGED REASONS CITED IN DEFENDANT'S § 5010(e) REPORTS IN SUPPORT OF ORIGINAL GOVERNMENT RECOMMENDATION THAT HE BE SENTENCED AS AN ADULT, WHICH THE GOVERNMENT LATER ABANDONED.

On June 20, 1973, the Defendant was committed to the Lorton Youth Center I in Lorton, Virginia, for a period of observation and study pursuant to § 5010(e) of the Federal Youth Corrections Act. Once there, he was given a daily work assignment and, over a two-week period, received both group and individual intelligence and personality testing. He also received group orientation to the evaluative process from the Director of the Diagnostic Center at the Youth Center and participated in two private interviews, one with the Classification and Parole Officer which lasted one hour, and the second with the clinical psychologist which lasted two hours. These two professional staff members, together with the Director, comprised the Classification Committee responsible for the preparation of the Defendant's § 5010(e) report and recommendation. The Director, who also served as Chairperson of the Committee, did no independent investigation into the Defendant's situation, nor did he conduct a private interview (Tr. 310). The Classification and Parole Officer, (hereinafter, "Classification Officer") on the other hand, visited the Defendant's community and spoke at length with the Defendant's family as part of his effort to prepare a "social history" for the Committee (Tr. 310). For his part, the psychologist relied upon the test results and his impression of the Defendant during the two-hour period of combined testing and interviewing for the preparation of his "Psychological Evaluation" for the Committee (Tr. 310).

The subsequent hearing revealed that the Committee met once, in the words of the Classification Officer, to review ". . . all the information that we had on the social background, psychological information, vocational evaluation, observations of Mr. Norcome during that period of observation" (Tr. 18). The Parole Officer delivered an *oral* report on the Defendant's social background that included discussion of the Defendant's employment history, use of drugs, juvenile record,[5] a pending charge [6] and the crime for which he was convicted. The psychologist also delivered an oral report to the Committee in which he discussed his evaluation of the Defendant's character traits. He discussed at length the Defendant's intellectual capabilities and general personality as viewed on the basis of the test results. After these presentations, all three members considered the circumstances of the case as presented, and arrived at their recommendation that the Defendant be sentenced as an adult. Some time after the meeting, on the basis of what he recalled from the Committee's discussion, the Classification Officer wrote the recommendation that would ultimately reach the Court. In addition, he later wrote the "Classification Study" setting forth the findings he had earlier reported at the meeting. Similarly, after the meeting, the clinical psychologist wrote his "Psychological Evaluation" which, along with the other study and recommendation, comprised the full report submitted to the Court. That report cited seven reasons for recommending that the Defendant be sentenced as an adult pursuant to the terms of 18 U.S.C. § 4208(a)(2):

(1) His need for long-term treatment;

(2) His need for a structured setting;

(3) The seriousness of the instant case and pending charge;

(4) His fairly extensive history of acting out;

(5) His drug involvement;

(6) His lack of interest in or amenability to Youth Center programs; and

---

5. See pages 37–40, *infra*.

6. This charge was dismissed six weeks before the reports were prepared.

(7) His lack of motivation to alter his present hedonistic behavior.

The report, entitled "Classification Committee's Evaluation and Recommendation" was submitted to the Superintendent of the Youth Center, who forwarded the report with his concurrence to the District of Columbia Board of Parole for its independent review. The Board in fact made no independent investigation into the reasons contained in the report or the facts in support thereof. In particular, the Board did not interview the Defendant. Nonetheless, in its letter of transmittal to the Court in which the Board concurred in the findings of the Report, the Board added two additional reasons to buttress the recommendation that the Defendant be denied Youth Act treatment and sentenced as an adult. Those reasons were:

(1) His succession of arrests as a juvenile; and

(2) His quite minimal work history.

The witnesses, upon taking the stand, were asked by the defense counsel and, on occasion, by the Court, to explain the meaning of each of the above reasons, the factors upon which the conclusions in the report were based, and the general process by which the administrative decisions in the instant matter were reached. The following sections of this Opinion focus consideration on the testimony relating to the individual reasons buttressing the Committee's recommendation, along with several further elements that figured significantly in the Defendant's diagnostic experience.

### 1. *The Defendant's Alleged Need for Long-Term Treatment.*

At the hearing, members of the Committee and representatives of the Board demonstrated a lack of understanding of the goals of the Youth Corrections Act and an unfamiliarity with the eligibility criteria established in the Act and subsequent interpretations by the United States Court of Appeals for the District of Columbia Circuit.

Testimony on the overall question of how the Classification Committee determines whether an offender will receive benefit from the Act began with discussion about the guiding principles of the statute and the Congressional objective embodied therein. The Classification Officer, who was the primary draftsman of the reports and recommendations, stated in response to questioning from defense counsel that the Federal Youth Corrections Act was intended to "give first-time felons a chance . . . to rehabilitate themselves (Tr. 61–2). The clinical psychologist understood the Act to "provide rehabilitation of youths who fall under [its] provisions". (Tr. 125–6). The scope of coverage is a good deal broader than either of these witnesses realized. Both the language of the Act and its legislative history make clear the Congressional intent to require treatment for practically all youth offenders convicted of a federal offense.[7] Indeed, if the Court decides to deny Youth Act treatment to a youth, it must make an affirmative finding that he or she will not benefit from treatment thereunder. United States v. Waters, 141 U.S.App.D.C. 289, 437 F.2d 722 (1970); United States v. Ward, 147 U.S.App.D.C. 149, 454 F.2d 992 (1971). A basis for such a finding may be that the Defendant is seemingly incorrigible as evidenced by his recidivism in the face of earlier Youth Act treatment efforts or by such lack of motivation that treatment within the scope of the Act would be of no significant benefit. United States v. Waters, *supra*. United States v. Phillips, 156 U.S.App.D.C. 217, 479 F.2d 1200, 1205–1206; (D.C.Cir.1973); United States v. Butler, 156 U.S.App.D.C. 356, 481 F.2d 531, 537 (1973).

Members of the Committee were asked whether they were aware that a youth offender possessed a presumptive right to Youth Act treatment in facilities segregated from adult offenders and, in light of this presumption, whether they employed a narrow standard of

---

7. See 18 U.S.C. § 5010(a)–(e); H.R.Rep.No.2979, 81st Cong., 2nd Sess. 2 U.S.Code Cong. Service 1950, pp. 3983, 3984–3985.

incorrigibility[8] or "no benefit"[9] from Youth Act treatment before recommending that a youth be sentenced as an adult. The Classification Officer explained that he was unaware of such a presumption and, therefore, did not apply a "no benefit" test before deciding to recommend against a Youth Act Commitment for the Defendant (Tr. 63–4). He testified that he based his recommendation solely upon the Defendant's social history, his reported behavior and the psychological evaluation (Tr. 7). The psychologist stated that he did not know of a presumptive right to treatment accorded youth offenders under the Act (Tr. 127). He went on to explain that he did not believe the Defendant to be incorrigible and did not recommend an adult sentence on that basis. Finally, the Chairperson of the Committee testified that he did not act in consideration of a presumption, but employed a "substantial benefit" test in determining whether the Defendant was eligible for Youth Act treatment (Tr. 197). Once it became clear that each of the Committee members believed the Defendant to be treatable to some extent, they were asked individually why they recommended a sentence that would not segregate Mr. Norcome from the influence of adult offenders in the manner Congress provided. Each of the men testified that his recommendation in this regard was based on the Defendant's need for "long-term treatment" (Tr. 30–1, 220, 267–8).

The Act expressly provides for sentencing of those who "may not be able to derive maximum benefit from treatment by the Division prior to the expiration of six years" under the Act for a term not to exceed the maximum period "authorized by law for the offense or offenses of which he stands convicted." 18 U.S.C. § 5010(c). Accordingly, the Court of Appeals for this Circuit has reversed sentencing decisions which rely on a § 5010(e) report and recommendation that leans heavily on a youth's need for "long-term treatment as a basis for recommending against sentencing under the Act's commitment provisions." United States v. Coefield, supra. At the hearing, members of the Classification Committee were questioned about their application of the long-term treatment criterion. The Classification Officer expressed the following view:

Q. Do you think that a youth's need for treatment for a period of between one and two years would warrant recommending him for an adult sentence, rather than for a Youth Act?

A. Normally speaking, we are not geared to keep a man longer than a year. (Tr. 30–1).

The Director of the Diagnostic Center commented on the length of treatment and its relation to the Defendant in the following colloquy:

Q. Mr. Cheek, what did you mean when you said in the Classification Committee's evaluation and recommendation that any treatment plan for the subject was seen as rather long-term? How long is "rather long-term"?

A. More than the usual time that a person serves under the Federal Youth Corrections Act at the Lorton Center . . .

Q. More than the usual term served at the Lorton Youth Center?

A. Yes.

---

8. The Senate Committee on the Judiciary in reporting on the proposed Act: "If . . . the judge is convinced the youth is incorrigible and would derive no help from the program, he may sentence him under any applicable provision of law" S.Rep.No.1180, 81st Cong., 1st Sess. 5 (1949) ; United States v. Waters, supra.

9. United States v. Waters, supra:
"These considerations [of substituting rehabilitative treatment for retributive pun-

ishment] do not, of course, prevent the trial judge from exercising his sound discretion to deny such rehabilitative treatment to those youths in the exceptional case where the judge determines that the special youth treatment afforded by the Act would be of no value". 437 F.2d at 724.

Q. And what is that?

A. Two or three years, more than two years or so.

Q. More than two years?

A. No.

Q. Now, did you consider a sentence under the provisions of § 5010(c) for Mr. Norcome?

A. I am certain it was discussed.

Q. Why was he not seen as eligible for such a commitment?

A. Because, while the § 5010(c) commitments are somewhat longer than those under § 5010(b), we felt that the usual stay for a § 5010(c) would probably not be sufficient.

Q. By the "usual stay", what are you referring to?

A. I think of—well, I am not certain. I cannot—well, let's say that I cannot, with any degree of accuracy, state, but I think it is somewhere around *20 to 24 months*, something like that. (Emphasis added)

(Tr. 220-4)

■ From their testimony, it was evident that members of the Classification Committee do not know the extent to which Congress provided long-term treatment in 18 U.S.C. § 5010(c). Without such knowledge, it is impossible for the Committee to meaningfully accomplish the requisite careful balancing of sentencing alternatives in the effort to determine that which is the least restrictive of the Defendant's presumptive right to treatment.[10]

Other testimony indicated that the departure from the long-term treatment schemata provided in § 5010(c) was, in fact, a policy determination of the District of Columbia corrections authorities. The Vice-Chairperson of the D.C. Parole Board testified that the Board recommends an adult sentence if it is apparent from the § 5010(e) study that a defendant cannot benefit from a treatment program of approximately *one* year's duration. (Tr. 371-2). It is apparent that this policy is implemented by the diagnostic staff at the Youth Center where the Defendant underwent his original § 5010(e) study. The administrator of the Center commented as follows on the length of treatment factor:

THE WITNESS: "If someone is recommended and long-term treatment is indicated, I would agree that he not be sentenced under the Youth Act . . . if the man needs long-term incarceration, he would be sentenced as an adult, and not as a youth.

. THE COURT: Then, you would be against § 5010(c) and you think that the Court should ignore that provision of the Youth Corrections Act?

THE WITNESS: Yes, sir."

(Tr. 187-8).

■ There is little doubt that the policy of limiting eligibility to those with short-term treatment needs arises out of the physical limitations of the staff and facilities. However, the Court has once before, in light of the Congressional will that all but the "exceptional case" of the incorrigible youth be sentenced under the Act, ordered that facilities adequate to handle all but the "exceptional case" be provided. United States v. Alsbrook, 336 F.Supp. 973 (D.C.D.C.1971). (Gesell, J.) In addition to the facilities themselves, there must be an adequate

10. The Federal Youth Corrections Act incorporates an approach to sentencing described as the "least drastic sentencing alternative". *See* Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The Model Penal Code, the American Minimum Standards for Criminal Justice, and the sentencing standards of the National Advisory Commission on Standards and Goals have adopted this approach subsequent to the Youth Act's enactment. See Model Penal Code § 7.01 (1962); American Bar Association project on Minimum Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures § 2.3(c) and Comment at 72-73 (1967); National Advisory Commission on Criminal Justice Standards and Goals, Report on Corrections § 5.2 (1973).

and properly trained staff to administer a personalized diagnostic process that looks closely at a youth's background and treatment needs in recommending a sentencing structure for the youth that is consistent with the intent of Congress embodied in the Act. *If the economic cost is too great for Congress to expend in making the Youth Act a reality, then that is for Congress to decide. This Court cannot be a party to a "coverup" of the Act's shortcomings that denies eligible youths the opportunity afforded them under the Act to respond beneficially to treatment, have their records expunged and move into a healthy and productive life in society.*

### 2. Defendant's Alleged Need For a "Structured Setting":

The Committee reported to the Court that the Defendant's need for a "structured setting" counseled against committing him to Youth Act programs. The term "structured setting" carries little meaning in the context of penal institutions since all are structured to some degree. In the Court's opinion, a "structured setting" envisioned under the Act would be diversified in nature and capable of accommodating youths with varying rehabilitative needs and potential. Such a format is suggested in the statute where it provides for facilities which range from minimum to maximum security. 18 U.S.C. § 5011. At the hearing, defense counsel asked members of the Classification Committee to define a "structured setting" and comment on whether the need for tight security was the basis for recommending an adult prison setting. The Classification Officer and the psychologist established that a youth facility itself came within the meaning of the term "structured setting". (Tr. 42, 229). In light of this broad definition, these gentlemen were unable to describe with particularity the reasons why Defendant's need for a structured setting could not be satisfied by the setting provided at the Lorton Youth Center. The Classification Officer, for example, stated:

" 'Structured setting', I am sorry, as I say, I have used for a number of years as a catchall phrase, so to speak, for correctional institutions. * * * Being as we recommend an adult sentence, we, therefore, meant an adult correctional institution." (Tr. 52).

While the Court has no problem understanding that both a Youth Center and a prison are "structured settings", the Classification Officer's employment of this factor in the Committee's recommendation fails to distinguish between the two insofar as the Defendant's special treatment needs are concerned. The circularity of the Classification Officer's reasoning on the use of the term "structured setting" in the report reflects the shallowness of the term as a basis for recommending against Youth Act treatment. *The term has become a cliche that has no place in a meaningful statement of findings on whether or not the Defendant will derive benefit from participation in Youth Act programs. Furthermore, reliance on the phrase "structured setting" is contrary to the Congressional purpose reflected in 18 U.S.C. § 5011 to provide a variety of environments capable of handling even the most alienated and aggressive young people.*

In United States v. Ward, *supra*, the Court of Appeals found inadequate a finding of ineligibility for a "program of discipline, guidance, and control firmer and more strict than provided by Youth Corrections". The Court of Appeals stated:

"The judge's view that appellant needs a program sterner than [a Youth Act] commitment would afford does not negate the possibility that appellant nonetheless might be helped significantly by just such a commitment". 147 U.S.App.D.C. at 152, 454 F.2d at 993–995.

If an offender requires a degree of security not available locally at Lorton which provides only "medium security" installations, then provisions must be made for carrying out the dictates of the Act by transferring youths committed for D.C.Code offenses to Federal Bureau of Prisons youth facilities which offer more security. The Act specifically provides for administrative coopera-

tion between the Bureau of Prisons and D.C. Corrections officials. See 18 U.S. C. § 5025. Thus, long-term planning for aggressive but potentially rehabilitable youth offenders is within the schemata of the statute and has applicability in local D.C.Code offenses.

### 3. *The Alleged Seriousness of the Instant Offense and the Fallacious Pending Charge.*

Members of the Classification Committee testified to the importance of the "seriousness of the offense" committed in arriving at their recommendation. However, as the Classification Officer stated, the notion of "seriousness" is not tied to any particular or aggravating circumstances of the criminal episode but to the crime *per se.* (Tr. 37–8). Thus, a bank robbery, of which the Defendant was convicted, is in and of itself a serious offense. Yet, the Act nowhere suggests that youths who commit such robberies or other crimes against people are exempted from the Act's treatment provisions. United States v. Howard, 146 U.S.App.D.C. 10, 449 F.2d 1086, 1092–1093 (1971). Therefore, if the term "seriousness of the offense" is to take on any significance in the Court's evaluation of a youth's capability for deriving benefit from Youth Act treatment, it must be because it is probative of the question of incorrigibility, as fully articulated in the report.

Testimony at the hearing on the questions of what is a serious crime, and how it relates to a youth offender's capability for benefitting from treatment demonstrated, in the case at bar, that the corrections personnel who worked on the Defendant's reports do not follow any *uniform criteria* as to the factors to be explored or the weight to be given particular matters. The result is misunderstanding and error. Two members of the Classification Committee testified that the fact the Defendant had committed armed bank robbery had an impact on their decision to recommend the Defendant for an adult sentence. (Tr. 37–8, 183–9). However, the Administrator

of the Lorton Youth Center testified that this factor was not a valid basis for finding the Defendant ineligible for a Youth Act Commitment (Tr. 299). Although he reviewed the staff findings and concurred in the recommendation to the Court, he testified that he ignored, as he does in all cases, the seriousness of the Defendant's crime (Tr. 299). Yet, from all appearances, the report which reached the Court reflected the full support of the Administrator in the substance of the findings.

*The staff, if it is to rely at all on the seriousness of the offense, must set forth in detail the relationship between the offense and the ultimate question of the Defendant's treatability. Moreover, where the Administrator of the staff appears to deem this criterion irrelevant to the diagnostic process, it is incumbent upon him to inform the Court as well as his staff which factors he believes should be excluded and which factors he regards as legally applicable or significant. If the Administrator who reviews staff findings agrees with the recommendation on the basis of parts of the report's data, those portions should be delineated to facilitate the Court's understanding of what factors were uniformly applied and what conclusions were individually reached in relation thereto.*

The Administrator not only failed to inform the Court that he did not consider the "seriousness of the crime" aspect in making his concurrence with the Committee's findings, he also failed to explain that, in his review of the Committee's findings, he did not consider the Committee's use of the "pending charge" in his evaluation of the reasons for denying sentencing under the Act. The reason for disregarding this factor, he testified, was the possibility that pending charges might be dismissed. (Tr. 301). That is, of course, an excellent reason for discounting that factor. *The Committee, however, did make use of the pending charge factor, and testimony showed that the alleged existence of the charge was important to the deci-*

*sion to recommend an adult sentence.* (Tr. 190–1, 407, 480–1).

*Defense counsel introduced into the record of the hearing evidence showing that the charge listed by the Committee as pending had been dismissed on May 31, 1973, some weeks prior to the preparation of the original § 5010(e) study.* Because the Administrator of the Youth Center chose to ignore this factor, he attempted no independent investigation of the facts to determine the existence of the charge. *The dismissal went undetected.* This error, so testimony showed, was not insignificant. Administrators from the D.C. Board of Parole and the D.C. Department of Corrections, both of whom reviewed the report previous to its submission to the Court, testified that they would have changed their recommendation had they known that the Defendant's pending charge had been dismissed. (Tr. 407, 480–1). They, of course, relied on the review of the Administrator of the Youth Center who, in discounting the value of the pending charge in his evaluation of the case, failed to validate the findings of his staff.

4. *The Defendant's Allegedly Extensive History of "Acting Out":*

References in the § 5010(e) report itself to the Defendant's pattern of behavior do not support the finding that the Defendant has a history of acting out, which would counsel against a Youth Act sentence. For example, the Psychological Evaluation prepared by the psychologist states:

"His control is brittle and can break from sufficient provocation, at which times he could act out against other people. Such loss of control requires a good deal of stress, and most often he would be able to restrain himself and do no more than to behave in a negativistic manner."

Similarly, the Classification Committee acknowledged in its recommendation that:

"While here at the Youth Center, he is not considered to have presented any overt behavior problem and to have performed his institutional assignment without incident."

Thus, there is no indication that the Defendant was aggressive and assaultive and posed a discipline problem for the youth facility.

The criterion of a "history of acting out" was equated at the hearing with an extensive criminal record. All three members of the Classification Committee testified that they had been referring to the Defendant's prior criminal or delinquent activity as a guide to whether or not he had established a pattern of criminal behavior (Tr. 57–8, 154–6, 198–200). The record of such activity consisted of convictions of two dissimilar, minor offenses and one finding of delinquency as a juvenile. The Classification Officer, in particular, testified that he based his conclusion as to a pattern of criminal behavior on the Defendant's record of arrests as a juvenile (Tr. 105–6). The two remaining members also based their recommendation, in part, on a series of juvenile arrests which did not lead to a finding of delinquency. (Tr. 105–6, 304). The psychologist was asked by defense counsel to explain exactly what the elements of the Defendant's criminal activity were:

Q. You have stated that Mr. Norcome has exhibited a pattern of criminal activity. What I am trying to figure out is what factual basis there was for that statement.

A. As I said, I received a good deal of it from Mr. Norcome himself, when I was interviewing him.

Q. Did Mr. Norcome tell you that he developed a pattern of criminal activity?

A. No, he was telling me about various offenses he had been charged with.

Q. Charged with?

A. Yes.

Q. Did he tell you about any offenses that he had been convicted of?

A. Probably.

Q. Probably?

A. I can't recall now.

Q. You don't recall the difference?

A. I don't recall the difference?

Q. Do you treat information concerning charges of criminal activity any differently from the information concerning convictions?

A. Oh, yes.

Q. You do?

A. Yes.

Q. Then, what kind of record of convictions would you say that a defendant would .have to have before you describe him as having developed a pattern of criminal activity?

A. That would be—I suppose that would depend on the individual person, because I don't know that I have any cutoff point.

Q. You mean one person's pattern of criminal activity requires more crimes than another person's pattern?

A. Oh, yes, each person is different.

Q. Maybe you would like to elaborate on that. Do you have any general standards, before you pronounce somebody a criminal, of how many, or at least of what type of crimes he must have committed?

A. No, I don't have any general pattern.

It is significant that the Classification Committee did not closely relate the Defendant's alleged pattern of criminal behavior to a finding of incorrigibility. There was no explanation in the report or from the witness stand as to the relationship between his criminal record and the Defendant's being "incorrigible" or a "habitual offender". No attempt was made in the report to link the Defendant's experience of getting into trouble with the law to his amenability to treatment under the Act. Nor was the evidence presented to how that the Defendant's prior criminal record was distinguishable from the majority of those committed to Youth Act programs, which at Lorton involves a population of whom 90% have prior criminal records (Tr. 311).

5. *The Defendant's Alleged Drug Involvement:*

 The Court was frankly surprised to find this reason cited in the report since the treatment of youth offenders who are addicts is within the scope of treatment envisioned by the Act. Indeed, large numbers of offenders with histories of drug use have already been sentenced under the Act. Federal youth facilities such as the Kennedy Youth Center in Morgantown, West Virginia, and Ashland, Kentucky, have special psychotherapy programs for drug addicts.

Testimony at the hearing indicated that the fact of drug usage came from the comments of the Defendant's mother, whom the Classification Officer interviewed in the course of preparing his report (Tr. 38–9) Testimony did not resolve the conflict between the mother's assertions set forth in two different sections of the § 5010(e) report that the Defendant's drug use continued up until his arrest in the instant case, and the fact that his mother felt "that he was able to abstain from drugs" while on bond. The Chairperson attempted to correct the discrepancy in the report by testifying that he believed the statement by the mother implicating the Defendant in extensive drug use, but chose not to believe the mother's statement that the youth had abstained. (Tr. 207–14).

Aside from the question of the Defendant's recent use of drugs, there was no data contained in the report to explain the nature of the Defendant's so-called prior drug history. Once again, the Defendant's drug experience was not distinguished from those youth offenders committed to youth facilities at present or in the past. The administrator of the Lorton Youth Center stated that two years ago, 85% of the inmates at the Center had histories of drug use, and that presently approximately one-half of the inmate population had histories of drug use. Thus, with respect to prior drug use and criminal record, the Defendant is not regarded as different from the majority of youths committed to the Center pursuant to the Act. The same is true, as we shall see below, with respect to the Defendant's poor work history, which was also a criterion listed in support of the recommendation to sentence the Defendant as an adult.

6. *The Defendant's Alleged Lack of "Interest In" or "Amenability To" Youth Act Programs:*

 *A. Reliance on Defendant's Test Scores.*

The Defendant's level of interest in Youth Act programs was the primary consideration of the Classification Committee that contributed to the recommendation of an adult sentence because it allegedly offered some predictive validity to the § 5010(e) report's implication that the Defendant would not benefit from Youth Act treatment. The report, however, failed to indicate the basis for the conclusion that the Defendant was "not seen" as interested in Youth Act programs. Defense counsel questioned the Committee as to whether this conclusion was drawn from the Defendant's own declarations or from other data compiled by the Committee. The hearing established that the findings of the clinical psychologist were instrumental on the question of the Defendant's interest. According to the testimony of the Chairperson of the Committee, the tests administered by the psychologists provided conclusive evidence of the Defendant's unwillingness to participate in Youth Act programs. His views were stated in the following colloquy:

Q. Mr. Cheek, how could Mr. Norcome have convinced you that he was interested in your programs? What could he have done?

A. One thing, he could have verbalized an interest.

Q. He could have said he was interested?

A. The tests could have shown an interest.

Q. Are you saying that if he had said he was interested you would have taken that more seriously than you took the fact that he actually participated in programs?

A. No, not necessarily.

Q. All right.

A. What one says is not necessarily the truth all the time.

Q. Well, then, what could he have done to show you that your initial conclusion might have been in error?

A. It would have been difficult to convince us over the tests.

Q. The tests?

A. Yes.

(Tr. 176–8).

The aforementioned tests, which evaluate personality and intelligence were administered to defendant over one two-hour sitting. They include the Stanford Achievement tests, I.Q. tests, the Rorschach, Bender-Gestault, House-Tree-Person, and Sentence Completion tests. At the hearing, the psychologist was asked what bearing the tests had on the staff's conclusion that the Defendant is "incorrigible" or incapable of benefitting from Youth Act treatment. He

was unable to specifically correlate the test results to a "no benefit" finding, but stated that the test showed the Defendant to be "empty", "bland", and "childish", and that these characteristics along with other data contributed to the staff's recommendation. (Tr. 118–9, 465–6).

Frequently during his testimony, the psychologist explained that he used the personality test to get a full picture of the Defendant's personality and to learn about his traits, or his ways of responding to given classes of stimulii. Thus, the psychologist commented in pertinent part in his "Psychological Evaluation":

"Stressful situations increase his level of fear and tension, and he would try to walk away and leave such settings behind him. When caught up under conditions of continuing pressure, he would try to bottle up his feelings inside himself and rigidly control his behavior. His control is brittle and can break from sufficient provocation, at which times he could act out against other people. He does have some hostility toward women and has misgivings when he has to interact with them. * * * His inability to form close and meaningful ties with people has left him with many unfilled needs for affection and attention. * * * He is seen as having been easily led by [his peers], taking part in their activities with little thought about what he was doing. * * * "

In his diagnosis based on the test results and the interview, the psychologist, as can be seen above, identified particular weaknesses as well as certain strengths of the Defendant. However, he nowhere pinpointed the precise difficulty pertaining to the Defendant's maladjustment and his anti-social behavior. He was unable to better explain this relationship at the hearing. In his report, the psychologist refers to the behavior the present pattern of characteristics predicts, but fails to indicate how stable the pattern will remain or whether and

to what extent the Defendant will respond to rehabilitative treatment programs. Finally, there is no indication in the report that the diagnosis made on the basis of the Defendant's test results agrees with the diagnoses of other youth offenders who have been similarly tested and observed. Indeed, the report contains no assessment of those characteristics which soundly predict that a youth offender is not amenable to treatment.

The psychologist testified that the personality tests are a valuable asset for learning about the personality of a youth, particularly a young man such as the Defendant who is not very verbal and remains quiet throughout an interview. While the Court can appreciate the value of personality testing as an introductory tool for learning about an individual, it cannot accede to the reliance upon test results for determining an individual's capability to respond to treatment when the methods employed, such as the Rorschach method, are designed to test personality and not amenability to treatment. (Tr. 568–9). Such reliance might be warranted where the tests are made "valid" in that, to some degree, correctional authorities know what the tests measure or predict. But *testimony by the Director of the Diagnostic Center indicated that none of the tests used has been validated empirically with respect to measuring an individual's capability to benefit from Youth Act programs.* (Tr. 622–4). There is no information known to the Committee showing that individuals with very different backgrounds cannot benefit from Youth Act treatment. *If these personality and I.Q. tests are to be used by the diagnostic staff for predicting the success of special youth facility programs or therapy, they must be validated for that purpose.* The Court fully recognizes the value of personality testing in the diagnostic process, but tests that provide only a preliminary introduction to an individual's personality are not dispositive of the ultimate determination of whether or not to treat a youth offender in

special Youth Act facilities. Tests may be a nice, inexpensive and quick solution to the administrative problem of diagnosing many young offenders in crowded facilities over a short period of time, but nothing less than a full and complete inquiry is required.

B. *Standardized Intelligence Tests* [11] *With Their Built-In Cultural Bias Must Not Play a Significant Role in the Classification Committee's Recommendation Concerning a Youth Offender's Eligibility for Youth Act Treatment.*

One haunting conclusion reached by the Committee and set forth in the instant reports is stated:

"Ricardo Norcome is a somewhat intellectually limited youth with no ambition whatsoever except to fulfill his needs, so that as a result he shown (sic) no evidence that he wished to better himself academically, or abtain (sic) and hold meaningful employment". Classification Committee's Evaluation and Recommendations (undated).

Implicit in the above is the judgment that the Defendant's right to Youth Act treatment can be denied on the basis of his intellectual capability. However, *it is the Court's opinion that use of the criterion of relative intellectual ability as a basis to disqualify youth offenders constitutes an outright violation of the Act.* Congress intended that the Government provide treatment for practically all youth offenders, including educational and vocational training to facilitate the acquisition of new skills. 18

U.S.C. §§ 5010(b), 5011. Such training benefits are as valuable to a young offender as the right to public education, which this Court recently held could not be denied mentally retarded children consistent with the constitutional requirement of equal protection. Mills v. Board of Education, 348 F.Supp. 866 (D.D.C.1972). (Waddy, J.) There is simply no legitimate reason why youth offenders with low I.Q. scores should be denied Youth Act treatment in favor of intellectually superior offenders. Treatment must be made available to all sentenced under the Act's provisions if the Congressional objective to provide "a method and means that will effect rehabilitation and restore normality, rather than develop recidivists" is to be realized. H.R.Rep.No. 2979, 81st Cong., 2d Sess. (1950), U.S.Code Cong.Serv.1950, p. 3985.

The Committee's finding that the Defendant is a "somewhat intellectually limited youth with no ambition whatsoever" has limited support in the Psychological Evaluation prepared by the clinical psychologist in determining that the Defendant's limited intelligence impaired his prospects for benefitting from treatment under the Act. In his report, the psychologist describes the Defendant as a "rather empty person" whom the intelligence tests show "to be functioning in the dull-normal range on the non-verbal material." [12] The tests further show that the Defendant has "deficiencies in reading [which] lowered his scores in the verbal area." His scores also indicated that Defendant's "current academic achievement level as measured by the SAT was only 3.2".

---

11. "Measuring intelligence is in a completely different realm (from measuring one's capability for doing a particular job), both because of the immense moral and political overtones with which the very term is laden, and because intelligence can mean so many different things. To say that intelligence is what the tests measure, and that what the tests measure is important because intelligence is important, is to take the road which 'leads though the looking glass'. It would be equally logical to assume that intelligence is of no more consequence in human life than are scores on intelligence tests." Sorgen, Testing and Tracking in Public Schools, 24 Hastings L.J. 1129, 1173 (1973).

12. Defendant's performance on the non-verbal tests places him in a category containing 15% of the national population. See F. S. Freeman, "The Theory and Practice of Psychological Testing", 223 (Rev.Ed.1962).

█ *The Government's use of culturally biased intelligence tests to compile data that leads to the above conclusions and thereby helps to exclude individuals such as the Defendant from Youth Act treatment constitutes an arbitrary classification procedure that deals a heavy blow to disadvantaged and deprived minorities.* The unconstitutionality of such selection procedures in excluding individuals from education and vocational opportunities was recently condemned by Judge Skelly Wright of the United States District Court of Appeals for this Circuit, sitting as a District Judge pursuant to 28 U.S.C. § 291(c) in Hobson v. Hansen, 269 F. Supp. 401 (D.C.D.C.1967), aff'd. sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408, F.2d 175 (1969). After finding that the District of Columbia school's track system resulted in groupings correlating with income and race, Judge Wright stated:

"The evidence shows that the method by which track assignments are made depends essentially on standardized aptitude tests which, although given on a system-wide basis, are completely inappropriate for use with a large segment of the student body. Because these tests are standardized primarily on and are relevant to a white middle class group of students, they produce inaccurate and misleading test scores when given to lower class and Negro students. As a result, rather than being classified according to ability to learn, these students are in reality being classified according to their socio-economic or racial status, or—more precisely—according to environ-

mental and psychological factors which have nothing to do with innate ability."

269 F.Supp. at 514.

Judge Wright invalidated the use of the tests, thus requiring the school system to take account of the different backgrounds pupils bring to the first day of school. *The tests were held to be unreliable predictors of academic and social performance, particularly when applied to poor, black students who performed well below their actual ability on the I. Q. tests.* 269 F.Supp. at 474.

Students who performed poorly on the I.Q. tests and found themselves in the lowest track in the school system were destined to occupy the lower strata of the socio-economic order as adults once out of school. Hobson v. Hansen, *supra.*, 269 F.Supp. at 459–463.[13] While the students in *Hobson* who were poor test-takers found themselves condemned to a life of poverty, youth offenders like the Defendant who score poorly may suffer an even worse deprivation, which results in incarceration. Without the Youth Act opportunity to acquire new skills and build character in a peer group setting, a youth such as the Defendant would, in all likelihood, continue his anti-social behavior with little chance for rehabilitation. See National Advisory Commission on Criminal Justice Standards and Goals, Corrections 12–13 (1973).

The tests which the psychologist administered to the Defendant are, in part, the identical tests invalidated by the Court in *Hobson.* In fact, those tests, the Otis and Beta I.Q. tests, were used

---

13. Courts have also reviewed the use of intelligence tests as a job screening device. In Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972), the Second Circuit held that if competitive examinations for government-granted work opportunities ". . . have the *de facto* effect of discriminating significantly and substantially against Black and Puerto Rican applicants [or other racial groups]," then such screening procedures violate the equal protection clause if "the

tests themselves [do] not measure what they [purport] to measure", namely, the performance capabilities of those persons competing for particular jobs. 458 F.2d at 1170–1171, 1177. See also Armstead v. Starkville Municipal Separate School District, 461 F.2d 276 (5th Cir. 1972) ; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971) ; Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

at the Lorton Youth Center for the very study that Judge Wright relied upon in determining that the D.C. School's intelligence tests were an impermissible basis for track assignments. The Court held that the study indicated that the Otis test "can be a faulty predictor of actual achievement for disadvantaged students . . ." Respecting the Beta test, the Court held:

> "Although it would appear from this study that nonverbal tests are much the better for use with disadvantaged children, there is substantial evidence that nonverbal tests are subject to the same disabilities as verbal tests since both at base are testing learned skills." 269 F.Supp. at 487 (See also, A. Anastasi, Psychological Testing, 251 (3rd Ed. 1968).)

 The validation of these tests for determining a Defendant's capability for responding to Youth Act treatment and acquiring the new skills and habits necessary to beginning a productive and useful life *has not* been attempted by correctional authorities despite their reliance on the scores. The Director of the Classification Diagnostic Center testified that no studies have been undertaken to chart the behavioral patterns of youth offenders who take the test. (Tr. 626). Yet, the Classification Committee suggests in the Defendant's § 5010(e) reports that, in light of his limited intelligence and lack of motivation, he would not benefit from the opportunity under the Youth Act to learn job-related skills. However, "[t]here are many relevant factors, such as motivation, cultural backgrounds of specific minorities, that the tests cannot measure and they inevitably must impair its value as a predictor." DeFunis v. State of Washington, — U.S. —, —, 94 S.Ct. 1704, 1708, 40 L.Ed.2d 164 (Douglas, J., dissenting). *Correctional authorities must establish that the tests themselves measure what they purport to measure in the context of the diagnostic process undertaken pursuant to 18 U.S.C. § 5010(e).* See Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Short of such a showing the tests must not be the basis for barring youth offenders from Youth Act treatment.* If correctional authorities seek to use these tests not only for the purpose of planning an appropriate treatment program for an offender under the Act, but also to determine his or her eligibility, then the tests must be shown to measure abilities relevant to the type and background of the "offender" as well as the opportunities Youth Act offenders are provided. Otherwise, in light of the tests' racially discriminatory impact noted in the *Hobson* decision, the Court must discount any findings pertaining to a youth offender's treatability which are based upon the youth's test scores.

7. *The Defendant's Alleged Lack of Motivation to Alter his Present Hedonistic Behavior.*

The Defendant's motivation or lack thereof was also discussed at length in the Personality Evaluation Section of the § 5010(e) study's "Psychological Evaluation". That section provides in pertinent part:

> "While being emotionally immature and having a rather childish and unrealistic outlook, this man is seen as having developed a pattern of criminal activity. He is lacking in motivation and initiative, and has been satisfied to just drift along with whatever was going on around him. He has been little concerned about the consequences of what he was doing, being readily influenced and manipulated by other people. It is felt that he has no interest in changing himself or in modifying his behavior in any way. His is not regarded as being amenable to the program at the Youth Center or as likely to benefit from placement here." Psychological Evaluation, August, 1973.

The considerations that prompted the Committee to conclude that the Defendant was not motivated to change his hedonistic behavior could not be deter-

mined with any specificity at the hearing. The Classification Officer testified that his analysis of the Defendant's previous employment and school records contributed to the finding that he was unmotivated. (Tr. 16–7). Without pointing to any specific factor that supported the evaluation, the psychologist testified that he concluded the Defendant was unmotivated from "interviewing him, from the reports of the Classification Officer (which the psychologist heard orally at the time of the Committee's one meeting), and from the test results." (Tr. 119). The psychologist could not explain the manner in which his conclusion as to lack of motivation was supported by the test results. (Tr. 118–9). The Chairperson testified that his conclusion on the question of motivation was drawn from the presentations of the Classification Officer and the psychologist at the meeting. (Tr. 67). While this criterion of motivation generally, along with that of the Defendant's interest in Youth Act programs, might support a conclusion that a Defendant would not benefit from treatment,[14] the report together with the testimony of members of the Committee suggests that the factor of motivation was never truly applied by the staff to the facts of this case. Insofar as the Defendant was regarded as "immature" and "easily influenced", he would seem a proper subject for treatment in youth facilities. Indeed, there is information in the report itself indicating that the Defendant would benefit from vocational training available at the Youth Center:

> "Vocationally the subject does not claim any training. Our evaluation indicates that the subject is mechanically inclined, and likes working with the public." Classification Study, July 3, 1973.

Aside from the unreliability of the finding of "no interest" in Youth Act programs discussed earlier, and "lack of motivation" to change behavior, as set forth in the original report, the affirmance of both these findings in the Addendum Report conflicts with new evidence submitted to the Classification Committee subsequent to the Court ordering re-commitment for further study. The evidence referred to is a report entitled "update of Program Evaluation", and dated October 15, 1973. [See Court's Exhibit 1] This report was prepared by the staff at Youth Center II where the Defendant underwent his second § 5010(e) study ordered by the Court on August 29, 1973. [Actually, the Defendant had been transferred to Youth Center II on July 17, 1973 to await sentencing and thus was there for a three-month period.] The contrast between this report and the original § 5010(e) study is quite dramatic. The original report reads in part:

> "Ricardo Norcome is a somewhat intellectually limited youth with no ambition whatsoever except to fulfill his needs so that as a result he shown (sic) no evidence that he wished to better himself academically, or abtain (sic) and hold meaningful employment." Classification Committee's Evaluation and Recommendation (undated).

The staff report, *supra*, which only came to the Court's attention after two § 5010(e) studies from Youth Center II, states in pertinent part:

> "Mr. Norcome is one of the few people here who truly enjoy going to school . . . he is working quite diligently to raise his reading ability to an adequate level. To this end he has, reports indicate, attended extra classes and taken materials back to his dormitory for additional study.
> * * *
> He appears to have now moved away from his esteem of his delinquent street friends into more acceptable ideals. * * * Mr. Norcome has seemingly established his independence and responsibility to a degree that he can respond to some of the horseplay that occurs in the dormitory

---

14. United States v. Butler, *supra*.

without going too far or creating any disciplinary problem."

In light of these and other beneficial factors in the Defendant's adjustment to institutional life at Youth Center II, *the staff* recommended the following:

"In view of the progress Mr. Norcome has made here, and the lack of any indications that he is likely to again involve himself in criminal activities, it is the recommendation of the team that Mr. Norcome be sentenced under the Federal Youth Corrections Act. It is, however, felt that Mr. Norcome spend a rather lengthy period of time in the institution in order to provide him with the necessary resources for legitimate survival in the community, including specific vocational skills, an adequate educational level, and a realistic expectation of his potential for social success."

During his stay at Lorton Youth Center II, the Defendant had no contact with the Classification Committee. However, the Committee was assigned the responsibility of preparing the second § 5010(e) study, which they did on the basis of the updated staff report from Youth Center II cited above. In their Addendum Report to the Court, the Committee discounted the staff findings in the following manner:

"As seen in the enclosed report dated October 15, 1973 from Youth Center II, it is the feeling and opinion of that staff that Mr. Norcome has evidenced a great deal of motivation and participation in programs to merit commitment under the Federal Youth Corrections Act. However, * * * while the [defendant] is making a satisfactory adjustment at the Youth Center II, such in reality is felt to be a *superficial adjustment* and at the best, Mr. Norcome is exhibiting exemplary behavior, *not in a genuine effort to modify his behavior, but simply to avoid being sentenced as an adult." (Emphasis added).*

The use of the phrase "superficial adjustment" to describe the Defendant's performance at Youth Center II, as interpreted from the aforementioned staff report that made no use of such a characterization, was misleading. The staff report provides no information indicating that the Defendant's efforts to succeed in the facility's programs were "superficial" and the author of the administrative endorsement contained in the report testified that he had no intention to give any such impression to the Classification Committee:

Q. Mr. Soskin (Assistant Administrator of Youth Programs, Youth Center II), did your remarks written on the [staff] report say anything concerning a superficial adjustment?

A. None whatsoever.

Q. I would like to read you something, and ask you whether you think this is a fair interpretation of your remarks, sir:

"While the subject is currently making a satisfactory adjustment at Youth Center 2, such, in reality, is felt to be a superficial adjustment and, at best, Mr. Norcome is exhibiting exemplary behavior not in a genuine effort to modify his behavior, but simply to avoid being sentenced as an adult."

Would you consider that a fair interpretation of your endorsement on this report?

A. No.

(Tr. 455–6)

The failure of the Committee to define the phrase, "superficial adjustment" with any precision or support its conclusion with substantial data promoted misunderstanding. Once the Addendum was completed, it was sent to the D.C. Department of Corrections *without* the underlying raw material, most notably, the staff report which it had "interpreted". Thus, a staff report which spoke highly of the Defendant's motivation and achievement during his commitment at the youth facility was left out of the review stages of the recommenda-

tion process. The Department concurred in the Committee's affirmance of its recommendation for an adult sentence contained in the Addendum Report. The second study was then forwarded to the D.C. Board of Parole for final review before submission to the Court. Once again, without independently investigating the staff findings, the Board concurred in the new recommendation and further confused the question of the Defendant's adjustment during his recommitment by stating in its letter of transmittal to the Court:

"[i]t is felt that the reasoning given remains valid, and that in view of the current comments noting *superficial conformity*, there is little basis for any change now." Letter from H. Albion Ferrel, Vice Chairman, District of Columbia Board of Parole, to Hon. Charles R. Richey, November 28, 1973. (emphasis added).

 *Mr. Ferrel, author of the above letter, testified that the Board as well as the D.C. Department of Corrections should have had access to the favorable staff report submitted to the Committee.* (Tr. 417–9). He further stated that if the Parole Board had received a copy of the new findings along with the conflicting recommendation of the Committee, the Board would have given serious consideration to and perhaps recommended that the Defendant be immediately placed on *probation*. (Tr. 416.). This testimony underscores the need for procedural guidelines in the diagnostic process to enhance the reliability of the § 5010(e) report and recommendations. Meaningful administrative review of the Committee's decision would be facilitated if there were procedures for documenting and preserving the work product of the Committee and all the material it receives. Staff reports like that prepared by the diagnostic team at Youth Center II must be made available to those responsible for independently reviewing staff findings before they are submitted to the Court. Otherwise, those who review may merely adopt the phrasing of the report without truly ap-

preciating its import, as was the case here. Finally, the documentation of the Committee's work together with significant raw data the Committee receives must be submitted to the Court so that any conflicting findings or recommendations can be considered.

8. *Defendant's "Succession of Arrests as a Juvenile".*

A. *Reliance on the Defendant's Juvenile Record:*

 In its transmittal letter of August 20, 1973 that accompanied the original § 5010(e) study, the Board cited, as an additional reason for sentencing the Defendant as an adult, the Defendant's juvenile record. That record consists of charges such as the following: unlawfully entering a school, driving a vehicle without tags or a permit, non-support, disorderly conduct and simple assault. These charges were brought over a four-year period, and all were dismissed with the exception of the non-support charge. [In that charge, the Defendant was ordered to pay $10.00 a week.] It is inconceivable to the Court that the Board regards an instance such as the above as disqualifying of Youth Act eligibility. Congress intended that youths with juvenile records be treated in order to offset the possibility that they would embark on adult criminal careers. Such treatment must be accorded a youth offender with a juvenile record like the Defendant's unless he has shown himself resistant to the most intensive treatment efforts in the Youth Act correctional system, efforts which must be documented and explained in the § 5010(e) report. See United States v. Phillips, *supra*, 479 F.2d at 1204.

B. *Juvenile Records Should Not Be a Factor in the Classification Committee's Determination of a Youth Offender's Eligibility for a Youth Act Recommendation to the Court:*

 As noted above, the hearing indicated that District of Columbia correctional officials used the length of

the Defendant's juvenile record as a basis for recommending his disqualification from Youth Act treatment. Juvenile records are not indices of "incorrigibility" or habitual criminal behavior, and, therefore, a no-benefit finding must not be premised thereupon.[15] However, since the Court does review the juvenile record in its consideration of sentencing, it is important that the Classification Committee closely examine the record in an effort to verify each charge or adjudication contained therein, and to develop commentary on the relevancy of material in the record to the sentencing alternatives the Court is considering.

■■ The Court has several concerns regarding its own reliance on the juvenile record for purposes of sentencing. One significant problem involves the Court's consideration of records which contain old arrests or convictions that are constitutionally infirm. It is the Court's opinion that In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) when read in conjunction with United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), limits this Court's sentencing discretion respecting the use of juvenile records. In *In re Gault*, the Court held that the right to adequate notice of charges, the right to counsel, and the privilege against self-incrimination, apply to state juvenile proceedings through the Due Process Clause of the Fourteenth Amendment. The Court, in *Tucker, supra*, held that resentencing was necessary because the sentencing judge had taken into consideration two previous convictions obtained without counsel in violation of Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), in determining the length of the Defendant's sentence. Although the prior convictions were *pre-Gideon*, its retroactivity made the convictions constitutionally infirm at the time *Tucker* was sentenced. Since *Gault* extends the Sixth Amendment protections of *Gideon*

to juveniles and since *Gideon* is retroactive, it follows that such part of *Gault* which relates to the right of counsel for juveniles should likewise be applied retroactively. Thus, all juvenile adjudications which were infirm for want of counsel in light of *Tucker*, should not be considered by this Court as regards sentencing. Similarly, since *Gault* held that the right of confrontation and the privilege against self-incrimination must be afforded juveniles, any adjudication in which either right was denied should not be considered by this Court in its sentencing function.

■ Another problem arises where correctional officials draw impermissible inferences based upon the number of arrests listed in a juvenile's case. It is important to stress that arrests not followed by a finding of delinquency not be used to raise the implication that a youth was "guilty". Also it should not be used to reflect how he will respond to treatment under the Act. The fact of arrest must not be allowed to be a crutch leaned heavily upon by correctional authorities in recommending a youth to a graduate school of crime, namely, an adult penitentiary. In too many cases, a juvenile may be detained for what are known as "childrens' crimes", such as truancy or the so-called exhibition of a need for rehabilitation. What inference respecting treatment can be drawn from a juvenile record describing a young person's detention for such offenses? That a particular youth did not conform to behavioral norms? It is noteworthy that the profile of the average juvenile delinquent reveals a background of inner city residence, poverty, and parental unemployment. See "The President's Commission on Law Enforcement and Administration of Justice", The Challenge of Crime in a Free Society, 173–5, 179, 81 (1967); R. Clark, Crime in America, 242 (1970). An adverse inference arising from an arrest for exhibiting behavior that is modified by such an environment is nonsense and

---

15. See H.R.Rep.No.2979 81st Cong.2d Sess. 2 U.S.Code Cong.Serv.1950, pp. 3983, 3984–3985; United States v. Phillips, 156 U.S. App.D.C. 217, 479 F.2d 1200, 1204 (1973); United States v. Butler, 156 U.S.App.D.C. 356, 481 F.2d 531 (D.C.Cir.1973).

impermissible to a rational sentencing determination.

### 9. *Defendant's Alleged "Minimal Work History":*

 The Parole Board also cited the Defendant's work history as a reason to deny him treatment under the Act. The Board did not investigate his work history, but relied on the report of the Classification Officer. Although he did not explain it in his report, the Officer testified that his investigation into the Defendant's work record was incomplete at the time the § 5010(e) report and recommendation were completed and forwarded to the Administrator of the Youth Center for review. *Evidence produced at the hearing demonstrated that the Classification Officer's initial description of the Defendant's work history as poor was erroneous, at least in the context of Youth Act commitments.* Defense counsel introduced into the record a letter dated January 3, 1974 from the United States Probation Office to the Classification Committee that confirmed the Defendant's original declaration to the Classification Officer that he had worked for one year at the Library of Congress. *Mr. Ferrel, the Vice Chairperson of the D.C. Board of Parole, testified that knowledge of that job at the time the Board considered the Defendant's case would have removed the Defendant's work history as a factor supporting a recommendation against Youth Act sentencing.* (Tr. 386).

The reliance of the Committee and other corrections authorities upon erroneous factual data such as the Defendant's employment record can be corrected in the future through procedures that ensure the production of comprehensive and reliable information. One step would be for the members of Classification Committees to prepare their reports in writing on the factual material gathered before the Committee meets so that the data could be carefully considered by each member. Staff reports should note the source of all factual material contained therein as well as the latest date on which such information was verified.

In this way, the Committee will concern itself with more reliable information that is presented in a thoughtful, deliberate fashion.

## III

## SUBSTANTIVE AND PROCEDURAL INADEQUACIES OF THE § 5010 (e) DIAGNOSTIC PROCESS

 In light of the foregoing it is evident that there must be immediate and extensive retooling to transform the § 5010(e) study process into a reliable instrument with which the Court can thoroughly examine a youth offender's treatment needs and determine whether the youth should be committed pursuant to the special youth facility treatment provisions of the Act, 18 U.S.C. § 5010(b), (c), or as an adult pursuant to 18 U.S.C. § 5010(d). There is need for reform of a substantive nature to correct the present confusion among those who comprise the Classification Committees as to the factors that are legally applicable or relevant to the Court's important conclusion whether an offender will benefit from commitment under the Act. There is also the need for uniformity among the Committee's members and those who sit in review of their findings as to the relative weight which must be given to the factors that are relevant to the § 5010(e) inquiry. Aside from the need for uniform standards and criteria to guide the corrections authorities in preparing the § 5010(e) reports, there are serious inadequacies in the procedures by which the § 5010(e) studies are conducted. Certain of these inadequacies arise from the procedures employed by the Classification Committee in response to time pressures placed upon them and inadequate resources available to them, and others arise from poor networks of communication among members of the Committee and between the Committee and those who review its work. In consequence, significant information is omitted from the reports and factual errors abound. A further inadequacy of the current diagnostic process rests in the ability of those who participate in

the study and prepare the report. These personnel are in need of legal advice and training in the requirements of the Act. This is reflected in the aforementioned confusion as to the applicable factors to employ in the study and the relative weight to assign them. It is further reflected in the Committee's reliance on test results despite the inability of the Committee members to justify either in their reports or testimony the employment of test results as a basis for disqualifying a youth offender from Youth Act treatment.

 Pursuant to the Court's inherent powers as an Article III Court and under the Federal Youth Corrections Act and its supervisory power over the administration of criminal justice in the District of Columbia, the Court herein directs the United States Board of Parole, the Federal Bureau of Prisons, the D.C. Department of Corrections and the D.C. Board of Parole to confer with their legal advisors and the Office of the Attorney General of the United States and the Corporation Counsel for the District of Columbia and as a result thereof to jointly prepare and file with the Court a written set of proposed guidelines and standards to correct the present inadequacies of the diagnostic process and to ensure the preparation of reliable and useful § 5010(e) reports in the future. The proposed guidelines and standards should provide, *inter alia*, the following:

### FORMAT FOR CHANGE

a. The guidelines should set forth the applicable goals and principles of the Federal Youth Corrections Act, including the presumptive right to treatment of all youth offenders, the scope of treatment contemplated by the Act, the breadth of facilities intended, and the standard of "no benefit" or "incorrigibility" which is the only permissible basis for finding a youth ineligible for treatment in Youth Act facilities.

b. The guidelines should establish a uniform set of criteria to be applied by the Classification Committee in testing the treatability of youth offenders committed pursuant to 18 U.S.C. § 5010(e). Such factors should be precisely defined and their relevance to the "no benefit" standard should be detailed in each § 5010(e) report based upon verified facts which are accurate and not misleading.

If, upon application of these criteria to the information gathered by the Classification Committee, it appears likely that a youth will benefit from Youth Act treatment, the reasons should be set forth in detail to assist the Court in providing the proper sentencing structure and any appropriate recommendation regarding the place or nature of treatment. On the other hand, where a youth is found to be "incorrigible" and incapable of benefitting from Youth Act treatment the reasons for that judgment should be set forth in detail with all pertinent factual data closely related to the ultimate finding.

c. The guidelines should provide for differentiation between a youth's eligibility for treatment and the availability of resources to treat him. Where the latter obtains, there should be a provision for a detailed description by the administrators of the managerial considerations and resource allocation limitations that are the basis for any recommendation that an eligible youth nonetheless be sentenced as an adult.

d. The guidelines should provide for the documentation of the meetings of the Classification Committees and the inclusion of such documentation in the reports. The guidelines should also specify other materials and information gathered in the course of the staff investigation which should be included in each § 5010(e) report. In this regard, dissenting views of diagnostic personnel should be

made known to the Court as well as to those involved in the administrative review of the Committee's findings.

e. The guidelines should establish procedures for providing legal advice and training in the requirements of the Act as intended by Congress and interpreted by the courts. Training programs must be employed to adequately inform the diagnostic staff of their responsibility and function within the § 5010(e) process. The set of uniform criteria and the procedures for the staff to apply must not only be explained but understood and closely followed. *To the extent that intelligence and personality tests are used in the diagnostic process, staff members responsible for their administration must be expert and any taint of cultural bias against blacks and other members of minority groups must be eliminated at once.*

f. The guidelines should provide for ongoing coordination between the District of Columbia corrections officials and those in the Federal Bureau of Prisons system. Where necessary, the District should be in a position to call on the resources of the Federal system to relieve overcrowding and afford eligible youth offenders an opportunity for treatment under the Act's provision.

## IV. CONCLUSION

To paraphrase Mr. Justice Frankfurter, there comes a time when this Court should not be ignorant as judges of what we know as men. In this case it is clear that the whole "study" process in sentencing statutes demands a searching inquiry into the various tools and criteria being used to determine and recommend to judges whether a youth, a drug addict or others are amenable to treatment and rehabilitation. While it may be that Courts are incapable of formulating abstract standards for what is adequate treatment, it is clear that courts *are* capable of making individual determinations of whether a transgressor of our criminal code has been improperly denied his or her *right* to treatment.

If all of our various disciplines cannot come up with intelligible standards for correcting the injustices resulting from the mistakes and errors pointed out herein, it is time for us to admit our failures and start anew. Thus, those who talk prison reform for once have a golden opportunity to get to work. The great charitable foundations, the U.S. Congress, our great universities with multi-disciplines under one roof, and the Executive Branch of the Government, can all contribute to the solution—if there is one.

For those who have run afoul of our criminal laws, it is a verifiable fact that treatment and specialized training are better than incarceration standing alone. Furthermore, the Courts, the Congress, and the bar have a duty to scrutinize every aspect of what is happening in the field of corrections today. For example, the Court will not tolerate interference with its sentencing practices by the U.S. Department of Justice which seeks indirectly to impose mandatory minimum sentences and thus wholly disregard the intent and mandate of Congress with respect to sentencing matters under the Youth Corrections Act and the Narcotics Addict Rehabilitation Act. (See Appendices A & B). This is not only costly in terms of human misery, but it is also self-defeating in terms of the needs of society.

In accordance with the foregoing opinion, the government officials and agencies referred to in Part III of this Opinion will formulate guidelines and standards for future § 5010(e) studies and 18 U.S.C. § 4252 studies, and submit the same to the Court within 30 days from the date hereof. If an extension of time is needed, the Court will entertain a proper application, bearing in mind that the interests of justice require prompt and expeditious action to correct the inequities and illegal procedures recounted herein.

So ordered.

**federal register**

APPENDIX A

MONDAY, NOVEMBER 19, 1973

WASHINGTON, D.C.

Volume 38 ■ Number 222

PART III

# DEPARTMENT OF JUSTICE

■

# PRISONERS, YOUTH OFFENDERS, AND JUVENILE DELINQUENTS

## Parole, Statement of General Policy

31942

# RULES AND REGULATIONS

### Title 28—Judicial Administration
#### CHAPTER I—DEPARTMENT OF JUSTICE
#### PART 2—PAROLE, RELEASE, SUPERVISION, AND RECOMMITMENT OF PRISONERS, YOUTH OFFENDERS, AND JUVENILE DELINQUENTS
#### Parole, Statement of General Policy

Pursuant to the authority of 18 U.S.C. sections 4201–4210, 5001–5037, and 28 CFR Part O, Subpart V, the United States Board of Parole has adopted the following statement of policy, effective November 19, 1973.

The Board of Parole expressly disclaims that its rules or policy statements are subject to the rulemaking provisions of the Administrative Procedure Act and does not acquiesce in the order of the United States District Court for the District of Columbia, dated July 25, 1973, in *Richard Pickus, et al.* v. *U.S. Board of Parole*, Civil Action No. 112–73, from which order the Board of Parole has filed an appeal to the United States Court of Appeals for the District of Columbia Circuit.

This statement of policy is published in order to inform the public of the Board's customary paroling policy. The guidelines incorporated in this policy statement are merely indications of how the Board generally intends to exercise its discretion in making future parole release decisions.

Title 28 of CFR is amended as follows by the addition of § 2.52 to read as set forth below.

Dated November 11, 1973.

MAURICE H. SIGLER,
*Chairman, U.S. Board of Parole.*

**§ 2.52 Paroling policy guidelines; statement of general policy.**

(a) To establish a national paroling policy, promote a more consistent exercise of discretion, and enable fairer and more equitable decision-making without removing individual case consideration, the United States Board of Parole has adopted guidelines for parole release consideration.

(b) These guidelines indicate the customary range of time to be served before release for various combinations of offense (severity) and offender (parole prognosis) characteristics. The time ranges specified by the guidelines are established for cases with good institutional adjustment and program progress.

(c) It is to be stressed that these ranges are merely guidelines. Where the circumstances warrant, decisions outside of the guidelines (either above or below) may be rendered. For example, cases with exceptionally good institutional program achievement may be considered for earlier release.

(d) The guidelines contain examples of offense behaviors for each severity level. However, especially mitigating or aggravating circumstances in a particular case may justify a decision or a severity rating different from that listed.

(e) An evaluation sheet containing a "salient factor score" serves as an aid in determining the parole prognosis (potential risk of parole violation). However, where the circumstances warrant, clinical evaluation of risk may override this predictive aid.

(f) These guidelines do not apply to parole revocation or reparole considerations. The Board shall review the guidelines periodically and may revise or modify them at any time deemed appropriate.

TABLE I—ADULT GUIDELINES FOR DECISION-MAKING

CUSTOMARY TOTAL TIME (IN MONTHS) SERVED BEFORE RELEASE (INCLUDING JAIL TIME)

(REVISED OCTOBER 1973)

| Offense Characteristics—Severity of Offense Behavior (Examples) | Offender Characteristics—Parole Prognosis (Salient Factor Score) | | | |
|---|---|---|---|---|
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| **Low** Immigration law violations; Minor theft (includes larceny and simple possession of stolen property less than $1,000); Walkaway | 6–10 | 8–12 | 10–14 | 12–16 |
| **Low moderate** Alcohol law violations; Counterfeit currency (passing/possession less than $1,000); Firearms act, possession/purchase/sale—single weapon—not altered or machine gun; Forgery/Fraud (less than $1,000); Drugs: Marijuana, possession (less than $500); Selective Service Act violations; Theft from mail | 8–12 | 12–16 | 16–20 | 20–25 |
| **Moderate** Bribery of public officials; Counterfeit currency (passing/possession $1,000–$20,000); Drugs: "Heavy Narcotics", possession by addict (less than $500); Marijuana, possession ($500 or over); Marijuana, sale (less than $5,000); "Soft Drugs", possession (less than $5,000); "Soft Drugs", sale (less than $500); Embezzlement (less than $20,000); Explosives, possession/transportation; Firearms Act, possession/purchase/sale—altered weapon(s), machine gun(s), or multiple weapons; Income tax evasion; Interstate transportation of stolen/forged securities (less than $20,000); Mailing threatening communications; Mann Act (no force—commercial purposes); Misprision of felony; Receiving stolen property with intent to resell (less than $20,000); Smuggler of aliens; Theft, forgery/fraud ($1,000–$19,999); Theft of motor vehicle (not multiple theft or for resale) | 12–16 | 16–20 | 20–24 | 24–30 |
| **High** Burglary (bank or post office); Counterfeit currency (passing/possession more than $20,000); Counterfeiting (manufacturing); Drugs: "Heavy Narcotics", possession by addict ($500 or more); "Heavy Narcotics", sale to support own habit; Marijuana, sale ($5,000 or more); "Soft Drugs", possession ($5,000 or more); "Soft Drugs", sale ($500–$5,000); Embezzlement ($20,000–$100,000); Interstate transportation of stolen/forged securities ($20,000 or over); Organized vehicle theft; Receiving stolen property ($20,000 or over); Robbery (no weapon or injury); Theft, forgery/fraud ($20,000–$100,000) | 16–20 | 20–26 | 26–32 | 32–38 |
| **Very high** Armed robbery; Drugs: "Heavy Narcotics", possession by non-addict; "Heavy Narcotics", sale for profit (No prior conviction for sale of heavy narcotics); "Soft Drugs", sale (more than $5,000); Extortion; Mann Act (force); Sexual act (force) | 26–36 | 36–45 | 45–55 | 55–65 |
| **Greatest** Aggravated felony (e.g. armed robbery, sexual act, assault)—Weapon fired or serious injury; Aircraft hijacking; Drugs: "Heavy Narcotics", sale for profit (prior conviction(s) for sale of heavy narcotics); Espionage; Kidnapping; Willful homicide | (Specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category.) | | | |

Notes: 1. If an offense is not listed above, the proper category may be obtained by comparing the severity of the offense with those of similar offenses listed.
2. If an offense behavior can be classified under more than one category, the most serious applicable category is to be used.
3. If an offense behavior involved multiple separate offenses, the severity level may be increased.
4. If a continuance is to be recommended, allow 30 days (1 month) for release program provision.
5. These guidelines are predicated upon good institutional conduct and program performance.

## RULES AND REGULATIONS

TABLE II—YOUTH GUIDELINES FOR DECISION-MAKING

CUSTOMARY TOTAL TIME (IN MONTHS) SERVED BEFORE RELEASE (INCLUDING JAIL TIME)

(REVISED OCTOBER 1973)

| Offense Characteristics—Severity of Offense Behavior (Examples) | Offender Characteristics—Parole Prognosis (Salient Factor Score) | | | |
|---|---|---|---|---|
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| **Low** | 6–10 | 8–12 | 10–14 | 12–16 |
| Immigration law violations | | | | |
| Minor theft (includes larceny and simple possession of stolen property less than $1,000) | | | | |
| Walkaway | | | | |
| **Low moderate** | 8–12 | 12–16 | 16–20 | 20–25 |
| Alcohol law violations | | | | |
| Counterfeit currency (passing/possession less than $1,000) | | | | |
| Firearms act, possession/purchase/sale—single weapon—not altered or machine gun | | | | |
| Forgery/Fraud (less than $1,000) | | | | |
| Drugs: | | | | |
| Marijuana, possession (less than $500) | | | | |
| Selective Service Act violations | | | | |
| Theft from mail | | | | |
| **Moderate** | 9–13 | 13–17 | 17–21 | 21–26 |
| Bribery of public officials | | | | |
| Counterfeit currency (passing/possession $1,000–$20,000) | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by addict (less than $500) | | | | |
| Marijuana, possession ($500 or over) | | | | |
| Marijuana, sale (less than $5,000) | | | | |
| "Soft Drugs", possession (less than $5,000) | | | | |
| "Soft Drugs", sale (less than $500) | | | | |
| Embezzlement (less than $20,000) | | | | |
| Explosives, possession/transportation | | | | |
| Firearms Act, possession/purchase/sale—altered weapon(s), machine gun(s), or multiple weapons | | | | |
| Income tax evasion | | | | |
| Interstate transportation of stolen/forged securities (less than $20,000) | | | | |
| Mailing threatening communications | | | | |
| Mann Act (no force—commercial purposes) | | | | |
| Misprision of felony | | | | |
| Receiving stolen property with intent to resell (less than $20,000) | | | | |
| Smuggler of aliens | | | | |
| Theft, forgery/fraud ($1,000–$19,999) | | | | |
| Theft of motor vehicle (not multiple theft or for resale) | | | | |
| **High** | 12–16 | 16–20 | 20–24 | 24–28 |
| Burglary (bank or post office) | | | | |
| Counterfeit currency (passing/possession more than $20,000) | | | | |
| Counterfeiting (manufacturing) | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by addict ($500 or more) | | | | |
| "Heavy Narcotics", sale to support own habit | | | | |
| Marijuana, sale ($5,000 or more) | | | | |
| "Soft Drugs", possession ($5,000 or more) | | | | |
| "Soft Drugs", sale ($500 $5,000) | | | | |
| Embezzlement ($20,000–$100,000) | | | | |
| Interstate transportation of stolen/forged securities ($20,000 or over) | | | | |
| Organized vehicle theft | | | | |
| Receiving stolen property ($20,000 or over) | | | | |
| Robbery (no weapon or injury) | | | | |
| Theft, forgery/fraud ($20,000–$100,000) | | | | |
| **Very high** | 20–27 | 27–32 | 32–36 | 36–42 |
| Armed robbery | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by non-addict | | | | |
| "Heavy Narcotics", sale for profit (no prior conviction for sale of heavy narcotics) | | | | |
| "Soft Drugs", sale (more than $5,000) | | | | |
| Extortion | | | | |
| Mann Act (force) | | | | |
| Sexual Act (force) | | | | |
| **Greatest** | (Specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category.) | | | |
| Aggravated felony (e.g. armed robbery, sexual act, assault)—Weapon fired or serious injury | | | | |
| Aircraft hijacking | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", sale for profit (prior conviction(s) for sale of heavy narcotics) | | | | |
| Espionage | | | | |
| Kidnapping | | | | |
| Willful homicide | | | | |

Notes: 1. If an offense is not listed above, the proper category may be obtained by comparing the severity of the offense with those of similar offenses listed.
 2. If an offense behavior can be classified under more than one category, the most serious applicable category is to be used.
 3. If an offense behavior involved multiple separate offenses, the severity level may be increased.
 4. If a continuance is to be recommended, allow 30 days (1 month) for release program provision.
 5. These guidelines are predicated upon good institutional conduct and program performance.

## APPENDIX B

### RULES AND REGULATIONS

TABLE III—NARA GUIDELINES FOR DECISION-MAKING

CUSTOMARY TOTAL TIME (IN MONTHS) SERVED BEFORE RELEASE (INCLUDING JAIL TIME)

(REVISED OCTOBER 1973)

| Offense Characteristics—Severity of Offense Behavior (Examples) | Offender Characteristics—Parole Prognosis (Salient Factor Score) | | | |
|---|---|---|---|---|
| | Very good (11–9) | Good (8–6) | Fair (5–4) | Poor (3–0) |
| **Low** | | | | |
| Immigration law violations | | | | |
| Minor theft (includes larceny and simple possession of stolen property less than $1,000) | | | | |
| Walkaway | | | | |
| **Low moderate** | | | | |
| Alcohol law violations | | | | |
| Counterfeit currency (passing/possession less than $1,000) | 6–12 | | 12–18 | |
| Firearms Act, possession/purchase/sale—single weapon—not altered or machine gun | | | | |
| Forgery/fraud (less than $1,000) | | | | |
| Drugs: | | | | |
| Marijuana, possession (less than $500) | | | | |
| Selective Service Act violations | | | | |
| Theft from mail | | | | |
| **Moderate** | | | | |
| Bribery of public officials | | | | |
| Counterfeit currency (passing/possession $1,000–$20,000) | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by addict (less than $500) | | | | |
| Marijuana, possession ($500 or over) | | | | |
| Marijuana, sale (less than $5,000) | | | | |
| "Soft Drugs", possession (less than $5,000) | | | | |
| "Soft Drugs", sale (less than $500) | | | | |
| Embezzlement (less than $20,000) | | | | |
| Explosives, possession/transportation | | | | |
| Firearms Act, possession/purchase/sale—altered weapon(s), machine gun(s), or multiple weapons | | | | |
| Income tax evasion | | | | |
| Interstate transportation of stolen/forged securities (less than $20,000) | | | | |
| Mailing threatening communications | | | | |
| Mann Act (no force-commercial purposes) | | | | |
| Misprision of felony | | | | |
| Receiving stolen property with intent to resell (less than $20,000) | 12–18 | | 18–24 | |
| Smuggler of Aliens | | | | |
| Theft, forgery/fraud ($1,000–$19,999) | | | | |
| Theft of motor vehicle (not multiple theft or for resale) | | | | |
| **High** | | | | |
| Burglary (Bank or Post Office) | | | | |
| Counterfeit currency (passing/possession more than $20,000) | | | | |
| Counterfeiting (manufacturing) | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by addict ($500 or more) | | | | |
| "Heavy Narcotics", sale to support own habit | | | | |
| Marijuana, sale ($5,000 or more) | | | | |
| "Soft Drugs", possession ($5,000 or more) | | | | |
| "Soft Drugs", sale ($500–$5,000) | | | | |
| Embezzlement ($20,000–$100,000) | | | | |
| Interstate transportation of stolen/forged securities ($20,000 or over) | | | | |
| Organized vehicle theft | | | | |
| Receiving stolen property ($20,000 or over) | | | | |
| Robbery (no weapon or injury) | | | | |
| Theft, forgery/fraud ($20,000–$100,000) | | | | |
| **Very high** | 20–26 | | 26–32 | |
| Armed robbery | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", possession by non-addict | | | | |
| "Heavy Narcotics", sale for profit [no prior conviction for sale of heavy narcotics] | | | | |
| "Soft Drugs", sale (more than $5,000) | | | | |
| Extortion | | | | |
| Mann Act (force) | | | | |
| Sexual Act (force) | | | | |
| **Greatest** | (Specific ranges are not given due to the limited number of cases and the extreme variations in severity possible within the category.) | | | |
| Aggravated felony (e.g., armed robbery, sexual act, assault)—weapon fired or serious injury | | | | |
| Aircraft hijacking | | | | |
| Drugs: | | | | |
| "Heavy Narcotics", sale for profit [prior conviction(s) for sale of heavy narcotics] | | | | |
| Espionage | | | | |
| Kidnapping | | | | |
| Willful homicide | | | | |

Notes: 1. If an offense is not listed above, the proper category may be obtained by comparing the severity of the offense with those of similar offenses listed.
 2. If an offense behavior can be classified under more than one category, the most serious applicable category is to be used.
 3. If an offense behavior involved multiple separate offenses, the severity level may be increased.
 4. If a continuance is to be recommended, allow 30 days (1 month) for release program provision.
 5. These guidelines are predicated upon good institutional conduct and program performance.

# RULES AND REGULATIONS

(Revised October 1973)

GUIDELINE EVALUATION WORKSHEET

Case Name _____ Register Number_____

### SALIENT FACTORS

Item A _____☐
 No prior convictions (adult or juvenile)=2
 One or two prior convictions=1
 Three or more prior convictions=0
Item B _____☐
 No prior incarcerations (adult or juvenile)=2
 One or two prior incarcerations=1
 Three or more prior incarcerations=0
Item C _____☐
 Age at first commitment (adult or juvenile) 18 years or older=1
 Otherwise=0
Item D _____☐
 Commitment offense did not involve auto theft=1
 Otherwise=0
Item E _____☐
 Never had parole revoked or been committed for a new offense while on parole=1
 Otherwise=0
Item F _____☐
 No history of heroin, cocaine, or barbiturate dependence=1
 Otherwise=0
Item G _____☐
 Has completed 12th grade or received GED=1
 Otherwise=0
Item H _____☐
 Verified employment (or full-time school attendance) for a total of at least 6 months during last 2 years in the
 community=1
 Otherwise=0
Item I _____☐
 Release plan to live with spouse and/or children=1
 Otherwise=0
Total Score _____☐
 Offense Severity: Rate the severity of the present offense by placing a check in the appropriate category. If there is
a disagreement, each examiner will initial the category he chooses.

Low _____
Low Moderate _____
Moderate _____
High _____
Very High _____
Greatest _____
 (e.g. willful homicide, kidnapping)

Jail Time (Months) ____ + Prison Time (Months) ____ =Total Time Served To Date _____ Months.
Guidelines Used: _____ Youth _____ Adult _____ NARA
Tentative Decision _____

[FR Doc. 73-24533 Filed 11-16-73; 8:45am]